ANDREW, J. T. C.
In this local property tax proceeding, plaintiffs seek a reduction in their assessment for the tax years of 1977, 1978 and 1979 on the basis that the assessment is in excess of true value. Plaintiffs also contend there is a lack of a common level of assessment in the taxing district, therefore the sales-assessment ratios promulgated by the Director of the Division of Taxation should be applied to afford relief from inequality in assessment. In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961). The assessment which was affirmed by the Monmouth County Board of Taxation for all years was as follows:
*174 Land $ 74,000
Improvements 1,900,000
Total $1,974,000
The subject of this litigation, commonly known as Munroe Towers, is a 15 story, reinforced concrete apartment building situate ón a 70,000 square foot parcel of land. The property is located at 610 Sewall Avenue, Asbury Park, and is officially designated as Block 134, Lots 1-11 and 14-21A on the tax map of the city.
The improvement was constructed in the time period of 1964 to 1966. It contains two office suites and 260 apartments, consisting of 176 one-bedroom apartments and 84 two-bedroom apartments. The building has a full basement, is serviced by four 2,000 pound capacity elevators and is heated by a steam heating system. There are approximately 202 parking spaces available for use by the tenants. It is conceded that the subject is well maintained.
The history of the property indicates that the United States Department of Housing and Urban Development (HUD) acquired title pursuant to a foreclosure action. HUD then conducted an auction on June 27, 1975, in order to eliminate the subject from its inventory. Plaintiffs were the successful purchasers. The terms of the sale included atypical financing arrangements. The purchase price was $2,752,000, however, HUD agreed to accept a 90% mortgage ($2,476,800) at a 6% return for 40 years. Additionally, the purchasers assumed no personal liability. In light of the extraordinary conditions of sale, the expert appraisers for both parties conceded that this sale did not constitute an arms-length transaction which could be used as the foundation of a value estimate. I agree. Rek Investment Co. v. Newark, 80 N.J.Super. 552, 194 A.2d 368 (App.Div.1963).
At the outset, the parties stipulated that the Director of the Division of Taxation’s average sales-assessment ratio for the tax years of 1977 and 1979 would be substituted for the lack of a common level of assessment within the municipality. It was *175 agreed that the court would apply such ratios to whatever value or values the court determined to be true values for 1977 and 1979. The stipulated substitutes for common levels were 72.51% for 1977 and 63.09% for 1979. The tax year of 1978 presented one of the issues for determination by this court. Plaintiffs contended that the Director’s sales-assessment ratio for 1978 (73.42%) should be applied to true value in order to relieve plaintiffs from inequality in assessment while defendant contended that the ratio promulgated by the Director pursuant to N.J.S.A. 54:2-40.4 (commonly known as Chapter 123, L.1973, c. 123) should be utilized to provide discrimination relief. Defendant argued that Chapter 123 was the exclusive remedy and hence the 1978 Chapter 123 ratio of 80% should be applied to true value provided, of course, the assessment ratio of the subject exceeded the upper limit as provided in the statute.
Each party relied upon the testimony of one valuation expert. Both experts offered their opinions of value based exclusively on the income approach to valuation. Each valuation expert estimated the value of the subject for each tax year. The expert for the taxpayers estimated ascending values of $1,952,400 for 1977, $1,980,400 for 1978 and $2,203,700 for 1979. City’s expert estimated varying descending values of $2,714,000 for 1977, $2,428,500 for 1978 and $2,607,000 for 1979. With regard to the gross income their only area of difference was relative to laundry income for the tax year of 1977. Plaintiffs’ expert used what he felt was actual laundry income of $2,523 while the city’s expert used $5,202 as actual income based on information he had received.
There were a number of other areas in which the two appraisers differed in their economic analyses. After the question of laundry income for 1977 the following were presented.
1. Taxpayers’ expert used actual vacancies for the three years in question while city’s expert stabilized the vacancy and collection loss factor at 5% of gross income.
2. Taxpayers’ expert used expenses that were derived from an accrual accounting method while city’s expert used expenses *176 obtained from plaintiffs’ income tax returns which were calculated on a cash basis of accounting.
3. Taxpayers’ expert allowed 5% of effective gross income for management while city’s expert allowed the same percentage but deducted therefrom one-half of the resident manager’s salary and salary of a secretary.
4. Taxpayers’ expert allowed 5% of gross income for repairs and maintenance along with the actual cost of painting and decorating while city’s expert maintained that painting and decorating should be subsumed within the 5% allowance for repairs and maintenance.
5. Taxpayers’ expert utilized a capitalization rate of 11.5% consisting of 9% return on investment and 2.5% return of investment (recapture) while city’s expert used an overall capitalization rate of 9.5%.
6. The last area in which the experts differed was in regard to the estimated land value. Taxpayers’ expert accepted the assessment of $74,000 as constituting true value while city’s expert ascribed a value of $520,000 to the land.
The court will consider all of the foregoing items beginning with the question of whether this court must use the ratio promulgated pursuant to Chapter 123 to provide relief from inequitable assessments.
I
It was conceded by the parties that this court would apply specific ratios to the true value determined by the court for 1977 and 1979. The parties agreed that the applicable ratios would be 72.51% for 1977 and 63.09% for 1979. The remaining question is what ratio should be applied to true value for 1978 in order to provide relief to the taxpayer for inequality in assessment.
The ratio studies presented by the taxpayer clearly reveal the absence of any semblance of a common level. The ratio clusters, range of ratios and the coefficients of deviation demonstrate beyond a fair preponderance of the evidence that no *177 common level existed in the City of Asbury Park during the tax year of 1978. As a matter of fact, the municipality did not even attempt to offer a defense to a claim of discrimination based on a lack of a common level of assessment. The city, instead, contends that the proper remedy and only remedy is the relief afforded by N.J.S.A. 54:2 40.4 (commonly known as Chapter 123, L.1973, c. 123). The ratio provided by this statute is 80%.
The taxpayers contend that this court can also apply the Director’s sales-assessment ratio of 73.42%. Taxpayers contend relief is available in the alternative while city argues exclusivity of Chapter 123.
The seminal case involving relief from inequality in assessment is In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961). In Kents, Chief Justice Weintraub, writing for a unanimous court, made it perfectly clear that when there is no semblance of a common level of assessment, the Director’s average ratio would be utilized to provide relief, with some exceptions not here pertinent. Based on this, taxpayers contend that relief should be granted beyond that permitted by an application of Chapter 123. Taxpayers assert that Chapter 123 cannot be exclusive because by its very terms it cannot be applied during a tax year in which the taxing district has completed a revaluation or reassessment. In order to establish discrimination in assessment during a revaluation year reliance must be placed upon the remedy prescribed in Kents. Taxpayers also indicate that there is nothing in the language of Chapter 123 which indicates an exclusive remedy in inequality in assessment matters.
I find that I am in agreement with taxpayers in this matter as to the claim of exclusivity. The history of Chapter 123 indicates that it was the Legislature’s way of providing a taxpayer with a simplified method of proving discrimination in assessment, rather than an attempt to provide an exclusive basis for relief. There is nothing in the language or history of Chapter 123 which points to exclusivity of remedy. Indeed, it is clear from its own terms that it cannot be applied in the year of *178 a revaluation or reassessment. However, it is unnecessary for this court to decide exclusivity. In Kents, the court revealed that it was not completely satisfied with the remedy it provided. There was some indication that perhaps an unweighted ratio would be better suited to provide relief than the Director’s weighted ratio. Id. at 32, 166 A.2d 763. The court also noted that it was aware of pending legislation which would utilize an unweighted ratio. Id. at 33,166 A.2d 763. The court concluded on this point by stating, “But until some better technique appears or some other suitable one is provided by statute, we are satisfied to utilize the average ratio in cases such as the one before us.” Ibid.
Hence, it is without doubt that the court utilized the tool which it had before it to afford a basis to compensate a wrong. The court did not consider it the only tool but rather the most suitable at the time, absent another equitable solution.
It is clear in this matter that plaintiffs are entitled to relief from discrimination. The question is whether relief can be adequately and equitably provided by means of an application of Chapter 123. Taxpayers have not contended that the relief envisioned in Chapter 123 is inequitable. Rather, it is contended that they have the option of seeking the lowest ratio to secure the greatest reduction. I do not believe that this would be in keeping with the rationale of Kents. Equitable and adequate relief provided by statutory enactment is sufficient to satisfy a constitutional claim of unequal treatment in violation of state law. Neither remedy provides mathematical perfection and absent a showing of inequity in the application of one remedy as opposed to another the court should defer to the legislative provision. This court cannot make a determination at this juncture as to whether Chapter 123 should be the method to provide relief because it is conceivable that the ratio of assessment to true value as determined by this court would fall within the common level range for the taxing district and hence provide no relief. In that situation the provisions of Chapter 123 may, indeed, be inadequate, especially in light of the fact *179 that the defendant concedes a ratio application, but seeks application of a higher ratio (80% as opposed to 73.42%). True value must first be determined in order to test the adequacy of the Chapter 123 remedy as opposed to use of the Director’s average ratio as was prescribed in Kents. A resolution of the factual differences in the two experts’ use of an economic analysis is necessary at this time before the appropriate ratio can be selected.
II
Both experts used the same income figures for 1978 and 1979. However, for 1977 taxpayers’ expert used a laundry income of $2,523 whereas city’s expert used $5,202. Taxpayers’ expert indicated that he derived his income figure from an FHA form 2410 which plaintiffs must submit to the Department of Housing and Urban Development (HUD) pursuant to the terms of the financing arrangement taxpayers had with HUD. His testimony was not altogether clear on this point. City’s expert relied upon an accountant for the city who had inspected plaintiffs’ books of account. The accountant indicated that he obtained the amount of $5,202 for laundry income from plaintiffs’ general ledger., I find that the testimony of the city’s accountant to be the more credible on this point and will accept the laundry income allowance as set forth by defendant’s expert of $5,202. This is supported by the fact that the latter amount is more in conformity with the income received from the same source for the subsequent tax years of 1978 and 1979.
III
The next area of divergence was with regard to the use of actual vacancies for the three tax years as opposed to a stabilized vacancy and collection loss factor of 5% for each tax year. Taxpayers’ expert used actual vacancies because he felt the subject was a problem building and had to be appraised on an “as is” basis. He also indicated that an agency of the Federal Government would not provide the same managerial talent as *180 supplied by plaintiffs. Attesting to the managerial acumen of plaintiffs was the fact that vacancies had declined substantially in three years. In 1977 the actual vacancy loss was 10.3% of potential gross income, 7.6% in 1978 and 4.4% in 1979.
Taxing district’s expert used a vacancy factor of 5% of gross income because he felt that an appraisal was an attempt to project an income pattern over a period of time and it was reasonable to assume that under typically competent management a 5% vacancy was an adequate allowance.
The selection of an appropriate vacancy factor is influenced by the quality and durability of the projected income and by typical vacancy levels, revealed by the present and past experience of the subject property and similar properties under like circumstances. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7ed 1978) 339; Kahn and Case, Real Estate Appraisal and Investment (2ed 1977) 132. In an income analysis the search is for the projected net income stream to be transformed into value by means of the capitalization process. A proper vacancy factor to be used in a projection of net income is not necessarily the actual vacancy experience but rather what an informed investor could reasonable foresee as a typical pattern.
In the present case, it must be observed that actual vacancies declined substantially in two years, from 10.3% to 4.4%. I find that this reflects reasonably competent private ownership and management. Taxpayers’ expert indicated that HUD could not manage the subject as effectively as plaintiffs. I, therefore, find that a 5% vacancy factor better reflects the attitude of a typical investor, viewing a potential purchase as of the relevant assessment dates that competent management will reduce existing vacancies as it, in fact, did.
IV
Another area in which the experts differed in their utilization of the income approach was in the use by taxpayers’ expert of expense figures derived from FHA forms 2410, which are pre *181 pared utilizing an accrual method of accounting, while city’s expert used a cost based set of expense figures derived from plaintiffs’ income tax returns.
Fundamental appraisal principles require an appraiser to reconstruct actual operating statements in order to avoid deficiencies which may be in an accountant’s operating statement. The Appraisal of Real Estate, supra at 357. The rationale is that actual operating statements may, among other things, include improper charges, omit certain items of expense and may be on a cash accounting basis unadjusted for a particular year. Ibid.
The terms “accrued” and “accrual” denote income that has been earned but not received or expenses that have been incurred but for which payment has not been made. Finney and Miller, Principles of Accounting (6ed 1963) 36 et seq. The avowed purpose of an accrual basis of accounting is to report income for the period during which it is earned regardless of when it is actually collected and to report expenses for the period during which they are incurred regardless of when the actual cash payment is made. Id. at 62.
The cash basis of accounting provides that income is earned when it is received and expenses are incurred when the actual cash expenditure occurs. Ibid.
The fundamental difference between the two methods is that the accrual basis achieves a proper matching of income and expenses by particular periods. This matching is not accomplished by the cash basis except to the extent that income is earned in the same period in which it is actually received and expenses are incurred and paid in the same period. Ibid.
Considering these accounting methods, there seems to be little question that the accrual method better reflects a typical pattern. It avoids having tax years with 11 months of expenses in some years and 13 months of expenses in other years. The only reasons given by city’s expert for use of cash basis figures were that cash basis is a “much more common way *182 of an owner or an appraiser to provide or receive the operating expenses of property” and that normally accrued accounting expense figures are not available. He also added that he had never heard any expert testifying in court as to expenses derived from accrual accounting. He had never heard that term used in the appraisal process in a tax proceeding.
The appraisal profession is aware of proper allocation procedures. In one of the leading texts on real property appraisal, the reader is directed to carefully review an actual operating statement because “it may be on a cash flow accounting basis unadjusted to a typical year." The Appraisal of Real Estate, supra, at 357. In Kahn and Case, Real Estate Appraisal and Investment (2 ed 1977) at 138, the authors state,
Fuel, insurance and real estate tax items, where the books are kept on a cash basis, are sometimes paid in one year for more than an annual period. In these cases, the outlays must be prorated to reflect normal annual charge.
Based on the foregoing, I will accept the accrual basis expenses as a better reflection of a typical pattern. This is not however to say that I accept entirely taxpayers’ expenses. There were two items of stabilized expenses which require review.
V
The next area of disagreement between the experts was with regard to the allowance of 5% of effective gross income for management fees. Taxpayers’ expert not only allowed for management, he also deducted as an expense the wages actually paid to all employees of the owner. While both appraisers used the same stabilized percentage, city’s expert deducted from his allowance, in amounts he understood to be correct, one-half of the resident superintendent’s salary and all of the salary actually paid to a secretary.
These deductions were made by city’s expert because he felt that at least half of the superintendent’s duties were attributable to management of the property and the secretary’s salary was totally attributable to a managerial function.
*183 The record indicated that the superintendent, during the three tax years in question, performed a variety of duties. He occasionally received rents from delinquent tenants, to prevent eviction proceedings, when instructed by the owner; occasionally informed mechanics such as plumbers and electricians as to the owner’s instructions with regard to repairs and maintenance of the subject property; received tenant’s complaints, normally after hours; showed apartments to prospective tenants; conducted interviews and made recommendations to the owner for the hiring of porters, guards and the assistant superintendent; supervised the porters or general clean up men; instructed the guards as to work schedules; reviewed tenant applications and made recommendations to the owner as to tenants and made repairs to boilers and toilets if the need arose.
The secretary performed the following functions. She received tenants’ complaints during business hours, showed apartments to prospective tenants when the superintendent was unavailable, and completed standard lease forms for tenants.
Management is a proper expense for every income-producing property regardless of whether an actual management fee is paid. The Appraisal of Real Estate, supra at 350. The management allowance reflects the considerable expenditure of time for accounting, rent collection, advertising and supervision, relative to the operation of a rental property, whether performed by an owner or a professional management firm. Ibid.
The allowance for management is not to be confused with salaries actually paid to employees necessary to maintain the property and provide the operational activities necessary to keep a multitenanted apartment such as the subject physically, functionally, and economically competitive. Id. at 352.
I find based on the testimony adduced in this matter that the stabilized expense for management is duplicative of items included in wages. The salary of the secretary is one of these items. The function performed by this employee, as heretofore indicated, would be provided by a management firm in return for their fee and is, therefore, properly subsumed in *184 the stabilized management expense and should not be included under wages. Therefore, her salary will be deducted from the management allowance.
I also find that the superintendent performs services properly considered part of the management function, and therefore, the inclusion of the entirety of his compensation under wages is partially duplicative of the stabilized figure allocated to management. Therefore, I will deduct one-half of the total compensation earned by the superintendent from the management allowance of 5%. Considering the duties performed by the superintendent, I find that approximately one-half of his duties were managerial in nature.
I find based on the copies of the Forms W2 (Wage and Tax Statements) introduced in evidence as of the pretax years that the secretary’s salary was $6,750 for 1977, $6,865 for 1978 and $7,275 for 1979. I also find based on the same exhibit that one-half of the resident superintendent’s compensation (which included an apartment rent free) was $6,560 for 1977, $6,620 for 1978 and $7,640 for 1979. The combined totals are $13,310 for 1977, $13,485 for 1978 and $14,915 for 1979. These approximate 2% of gross income for each tax year, therefore, I will, at this juncture, deduct 2% from the expenses estimated by taxpayers’ expert for each tax year.
VI
The experts did not agree in the area of repairs and maintenance. Taxpayers’ expert utilized a stabilized allowance of 5% of gross income for repairs and maintenance in addition to the actual cost of painting and decorating which latter expense approximated 2% of gross income on the average. City’s expert maintained that painting and decorating expenses should be included in the 5% allowance for repairs and maintenance.
Taxpayers’ expert was of the opinion that painting and decorating costs in a building such as the subject would exceed 5% of gross income. He supported his conclusion on the basis that, in a HUD financed project, there is a requirement that the apart *185 ments be painted every two years or earlier if a tenant leaves and, therefore, there is more painting expense than one would incur with a normal apartment building operation.
City’s expert felt that generally accepted appraisal practice dictates that, if one uses a stabilized allowance, as was done by taxpayers’ expert, painting and decorating be subsumed within an overall allowance for repairs and maintenance.
Standard appraisal texts do not provide a definitive answer to this conflict. The Appraisal of Real Estate, supra, at 352; Ring, The Valuation of Real Estate (2ed 1970) 223 et seq. The repairs and maintenance category of expenses usually includes expenses necessitated by the physical use of the property such as roof repair, window caulking, exterior painting and repair of heating, lighting and plumbing equipment. The Appraisal of Real Estate, supra, at 352. It has been indicated that decorating costs perhaps fit generally in the repairs and maintenance category. Ibid. However, this can vary according to local custom. Ibid. Concededly, a stabilized allowance for this item should be made because the cost of repairs, maintenance, painting and decorating can vary widely from year to year. There should be some stabilization at an average annual allowance.
I find that taxpayers’ actual expense for these items, for the years in question, average approximately $40,679. This is a good deal less than taxpayers’ expert’s allowance for the years of 1978 and 1979. The expert’s allowance exceeds the average by $7,109 in 1978 and by $9,151 in 1979. Not only is the average of these expenses in the vicinity of $40,000 but so also is the actual median expense ($40,254 for 1978).
I find that the three years of experience relative to actual expenses incurred as to these items indicates that a stabilized estimate of 6% of gross income should be used which would reflect all of the expense incurred for repairs, maintenance, painting and decorating. While a normal allowance, as indicated by both experts, would be 5% of gross income, I find that taxpayers’ expert’s opinion that a greater allowance is *186 necessary because of the HUD painting requirements is persuasive in light of the actual expenses incurred. Taxpayers’ expert has provided an allowance for all of the above mentioned items which approximates 7% of gross income. Since I have determined that a proper allowance would be 6% overall subsuming painting and decorating within the category of repairs and maintenance, I will deduct 1% from the expenses estimated by taxpayers’ expert for each year. This in conjunction with the deduction made in Part V above, will produce expenses of 36.6% for 1977 (39.6% advanced by taxpayers’ expert less 3%) 39.4% for 1978 (42.4% advanced by taxpayers’ expert less 3%) and 39.7% for 1979 (42.7% advanced by taxpayers’ expert less 3%). These percentages of expenses average approximately 39%, therefore, I will utilize expenses of 39% of gross income for each year. This estimate is well within acceptable parameters of expenses for the operation of an apartment house such as the subject.
VII
Another disputed area involved the selection of an appropriate capitalization rate. The city’s expert adopted an overall capitalization rate of 9.5% using a mortgage equity concept while taxpayers’ expert utilized a capitalization rate of 11.5% consisting of 9% return on investment and 2.5% return of investment or recapture. City’s expert defended his use of a mortgage-equity method of deriving his capitalization rate on the basis of average interest rates charged by 15 life insurance companies during the periods surrounding the appropriate assessment dates. He also considered average overall capitalization rates shown in the source material published by the American Institute of Real Estate Appraisers.
Based on this source material he estimated conventional financing would be available for the subject property at an interest rate of 9.5% for a term of 25 years at 80% of the property’s appraised value. He then estimated that the equity investment would require a return of 10%. Based on these assumptions he calculated a rate of 10.38% from which he deducted .88% to allow for equity buildup. *187 This method of formulating a capitalization rate was thoroughly discussed in Middlesex Builders v. Old Bridge Tp., 1 N.J.Tax 305, 311-313 (Tax Ct.1980). Therein it was stated that while the technique is sophisticated, its effectiveness depends, in part, upon the accuracy of the financing assumed to be available and the equity rate which an investor would desire on his equity investment.
The validity of the supporting material relied upon by city’s expert depends upon the accuracy of the basic interest rate and capitalization rate information as applied to the location of the subject. The source information was obtained from 15 life insurance companies located and doing business throughout the entire United States. Such published data is subject to considerable differences in interpretation. The information published by national organizations is not always drawn from properties comparable to the subject. They may not account for locational difficulties extant in a particular community. The data may apply to properties that may not be typical of the property involved in a local property tax proceeding.
Such published statistical material may be useful as a comparison check but is not persuasive without a showing that the subject fits the same category. Such a demonstration has not been made here. Additionally, I find no support for the use of an 80% loan ratio assumed to be available nor the equity yield rate selected. There is also no justification for the expert’s assumption that a 25 year loan would be made on a property with the foreclosure history of the subject. As a matter of fact, there is no proof that any lender would be willing to provide any mortgage money, at any rate, for a 15 story apartment building located in Asbury Park.
Taxpayers’ expert relied upon the straight capitalization technique with a load or surcharge recapture. He based his return on investment of 9% in 1977 and 1978 and 9.5% in 1979 on returns available on alternate investments. His allowance for recapture was 2.5% for all tax years. He based this allowance not on any concept of remaining economic life of the building *188 but rather upon the risks that are involved with the subject property. The amount was based on his judgment as to the rate of recapture that an investor would want relative to an investment in an apartment building located in Asbury Park. He did, however, consider alternate investments such as bonds that have less risk factors or opportunities for depreciation of capital.
In consideration of the economic and geographic location of the subject and the alternative investments available during the applicable period, I find the opinion of taxpayers’ expert relative to the proper capitalization rate to be more persuasive. I find that a rate of 11.5% (9% return and 2.5% recapture) more accurately reflects what the hypothetical investor would demand of a long term investment in the subject during the tax years in question. I have not ignored the use by taxpayers’ expert of a 9.5% return for 1979 but find in the interest of stability of assessments that the return should be 9% for all years. The assessment process cannot be so acutely sensitive to rates of return available in money markets to require an assessor to adjust his assessment rolls to yearly fluctuations. New Brunswick v. State of N. J., Div. of Tax Appeals, 39 N.J. 537, 550, 189 A.2d 702 (1963). “A rate of return should reflect conditions for a reasonable span of years.” Ibid.
VIII
Taxpayers’ expert accepted the land assessment of $74,-000 as representing true value while city’s expert indicated that the land value was $520,000. The latter value estimate was based on a determination that the land was worth $200 per apartment unit. City’s expert testified that he derived the estimate of $2000 per unit from the “marketplace”. There was no other substantiation for the asserted land value.
I find that I must accept the existing assessed value for land value since city’s expert failed to support his indicated land value with proofs by means of the recognized appraisal techniques for deriving land value. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7ed 1978) 140. *189 I find that the presumption of correctness of the county board judgment as to the land value controls. Aetna Life Insurance Co. v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952).
Pursuant to the foregoing, I have determined by means of the income approach that the value of the subject property is as follows:
1977
Gross Potential Rental Income $ 679,145
Less Vacancy and Collection Loss at 5% 33,957
Effective Rental Income 645,188
Income from Laundry Room Concessions 5,202
Effective Gross Income 650,390
Less Operating Expenses at 39% of Gross Potential Rental Income 264,867
Net Operating Income 385,523
Deduct Income to Land ($74,000 X 15.09)
(9% return + 6.09 effective tax) 11,167
Net Income to Improvements 374,356
$374,356 Capitalized at 17.59% (9% return, 2.5% recapture, 6.09% effective tax) (rounded) 2,128,300
Add Value of Land 74,000
Value $2,202,300
1978
Gross Potential Rental Income $ 693,618
Less Vacancy and Collection Loss at 5% 34,681
Effective Rental Income 658,937
Income from Laundry Room Concessions 6,129
Effective Gross Income 665,066
Less Operating Expenses at 39% of Gross Rent Potential 270,511
Net Operating Income 394,555
*190 1978
Deduct Income to Land ($74,000 X 15.79%) (9% return + 6.79% effective tax rate using Chapter 123 ratio) $ 11,685
Net Income to Improvements 382,870
$382,870 Capitalized at 18.29% (9% return, 2.5% recapture, 6.79% effective tax rate) (rounded) 2,093,400
Add Value of Land 74,000
Value $2,167,400
1979
Gross Potential Rental Income $ 736,629
Less Vacancy and Collection Loss at 5% 36,831
Effective Rental Income 699,798
Income from Laundry Room Concessions 6,333
Effective Gross Income $ 706,131
Less Operating Expenses at 39% of Gross Rent Potential ' 287,285
Net Operating Income 418,846
Deduct Income to Land ($74,000 X 14.94%) (9% return + 5.94% effective tax) 11,056
Net Income to Improvements 407,790
$407,790 Capitalized at 17.44% (9% return, 2.5% recapture, 5.94% effective tax) (rounded) 2,338,300
Add Value of Land 74,000
Value $2,412,300
At this point, it must be noted that the value determined for 1978 utilizing an effective tax rate that encompasses the Chapter 123 ratio of 80% for 1978 provides a ratio of assessment to true value of 91%. The common level range for *191 Asbury Park for 1978 had an upper limit of 92% and a lower limit of 68%. Since the assessment-true value ratio of the subject falls within the common level range no relief can be afforded by means of an application of Chapter 123. I find that in the context of the present matter, Chapter 123 fails to provide an adequate and equitable remedy as contemplated by the Supreme Court of New Jersey in In re Appeal of Kents, Inc., supra. This is especially so in light of the fact that defendant does not oppose a ratio application but rather seeks only to afford the taxing district a higher ratio in order to obtain a greater assessment for the tax year of 1978. Based on these circumstances, I find Chapter 123 inadequate and will apply the Director’s average ratio for 1978 to relieve the taxpayers from an inequitable assessment.
This necessitates a recalculation of the value for 1978 utilizing an effective tax rate that reflects the Director’s average ratio instead of the Chapter 123 ratio. This recomputation is as follows:
1978
Gross Potential Rental Income $ 693,618
Less Vacancy and Collection Loss at 5% 34,681
Effective Rental Income ' 658,937
Income from Laundry Room Concessions 6,129
Effective Gross Income 665,066
Less Operating Expenses at 39% of Gross Rent Potential _ 270,511
Net Operating Income 394,555
Deduct Income to Land ($74,000 X 15.23%) (9% return + 6.23% effective tax rate using Director’s ratio) 11,270
Net Income to Improvements 383,285
*192 1978
$383,285 Capitalized at 17.73% (9% return, 2.5% recapture, 6.23% effective tax rate) (rounded) $2,161,800
Add Value of Land 74,000
Value $2,235,800
The value as recomputed produces a ratio of assessment to true value of 88.3%. Compared to the Director’s average ratio for 1978 which is 73.42%, the difference is 20.27% (88.3 - 73.42 = 14.88 73.42 = 20.27%) which I find to be a substantial difference. Therefore, relief should be awarded pursuant to In re Appeal of Kents, Inc., supra.
Pursuant to the stipulation of the parties the Director’s ratio . for the tax years of 1977 and 1979 shall be applied to the determined true value and in accordance with this court’s determination that the Director’s ratio should also be applied in this case for 1978, I will direct the entry of judgments by the Clerk of the Tax Court as follows:
1977 1978 1979
Land $ 53,700 Land $ 53,300 Land $ 46,700
Imp. 1,543,200 Imp. 1,588,300 Imp. 1,475,300
Total $1,596,900 Total $1,641,600 Total $1,522,000