HOPKINS, J.T.C.
These consolidated local property tax appeals for the years 1977 to 1980, inclusive, involve property known as Block 3403, Lot 2 in the taxing district of Fort Lee. It will be referred to as Med West.
*569 Prior to commencement of the trial, taxpayer moved to freeze the assessment provided by the Tax Court judgment for 1977, pursuant to the Freeze Act, N.J.S.A. 54:2-43, for the years 1978 and 1979. The assessments and county board judgments, as well as the respective values proposed by the parties, are as follows:
Original Assessment County Board Judgment Borough’s Value Taxpayer’s Value
1977 $24,784,600 $14,596,747 $16,785,000 $13,832,100
1978 24,799,400 14.596.747 20.170.000 14,734,300
1979 24,799,400 14.596.747 23.600.000 15,487,200
1980 20,124,700 20,124,700 26.250.000 14,422,000
Med West is located on the north side of North Avenue between John Street and New Jersey State Highway Route 46. It has an area of 4.91 acres and is improved with a 26-story and basement luxury apartment building containing 507 units, a convenience store, two professional office suites, an underground parking garage and deck and an outside swimming pool. The apartment sizes range from two to six rooms with four-room apartments predominating. The building was constructed in 1973.
Fort Lee had a rent-leveling ordinance which was the subject of litigation during the periods here involved. However, the U.S. Department of Housing and Urban Development (HUD) preempted that ordinance on February 20, 1976 with respect to the subject building. Thereafter the rents were increased in accordance with the cost-of-living index. On August 28, 1979 the owners executed an option agreement to sell the property. It was exercised by the optionees on May 1, 1980 and the property was sold on April 30, 1981 for a stated sales price of $31,558,373.
Both parties presented the testimony of expert witnesses who gave opinions of the true value of the subject property as of the respective assessment dates. In so doing, taxpayer’s expert relied solely on the capitalization of income approach. In *570 addition to the capitalization of income approach, borough’s expert utilized a cost approach, a market approach and also one which has been designated as a discounted gross sellout approach. The latter is used in valuing properties subject to being converted from rental units to either cooperative or condominium units.
In arriving at the values under the capitalization of income approach, both experts utilized the annual financial statements which the taxpayer furnished to HUD as the properties were subject to mortgages guaranteed by the federal government. The figures used were those for the year prior to the tax year. Both experts acknowledged that the property was extremely well managed and they did not contest the fact that said rents as shown on the statements represented economic rents. In this respect, see Parkview Village Asso. v. Collingswood Bor., 62 N.J 21, 297 A.2d 842 (1972), where the court stated:
In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent, [at 34, 297 A.2d 842]
In accepting the gross rents shown on the HUD statements, the experts disagreed only with respect to the 1977 tax year. In accepting the figures for the 1976 calendar year, taxpayer’s expert excluded the rent escrow which was being held by the taxpayer pending resolution of litigation involving the Fort Lee rent-leveling ordinance. During that litigation, the landlord was permitted to increase rents by 2.5% and to escrow the difference between that 2.5% and the cost-of-living index increase. However, as the federal government had preempted that ordinance with respect to the subject property on February 20, 1976, the landlord was collecting the full cost-of-living indexed increase on the subject properties since that date. Accordingly, the escrowed amount should all be included in income as representing the rents which would be properly attributable to the subject building for purposes of *571 valuation on October 1, 1976. The parties also disagreed on vacancy and rent loss with the municipality taking the actual loss and the taxpayer’s expert using a 3% reduction. In view of the rent control litigation and the uncertainty as to apartment house rentals, it is deemed appropriate to accept the municipality’s approach and, accordingly, actual rent losses will be used. The only other disagreement was with respect to interest income. The interest income shown on the HUD financial statements was completely disregarded by the taxpayer’s expert while it was included in income by borough’s expert. The parties presented no evidence as to the source of that income. However, the court takes judicial notice of the fact that a landlord is entitled to a 1% return on security deposits and that such return is a normal incident in the operation of an apartment house. The interest income shown on the financial statements for 1976 and 1977 approximate that which would be realized by the taxpayer from that source and will be included in income. The interest shown on the statements for the years 1978 and 1979 exceed that which would be normally attributable to that source. Therefore, interest income for 1978 and 1979 will be included at 1% of an average monthly rent.
The parties are in agreement on insurance, fuel, electric and gas, and also, water and sewer service expenses. The actual repairs and maintenance figures utilized by taxpayer’s expert will be accepted. The reserves for replacements differ slightly. However, the basis on which the taxpayer’s expert computed his reserve is unsatisfactory in that it was not supported by a factual background which he was in a position to detail. Accordingly, the 2% reserve used by borough’s expert, which is generally accepted, will be used. Salaries and F.I.C.A. will be as detailed by borough’s expert. That amount was reduced by F.I.C.A. taxes properly allocable to management. Further, management, legal, auditing, advertising, leasing and telephone will be as detailed by the taxpayer’s expert. The miscellaneous deduction allowed by borough, which was 1% of the effective gross income, will be allowed except that it will be reduced by the specific miscellaneous deductions which were *572 included in the operations and maintenance expenses which were allowed in full.
In determining land value, the taxpayer’s expert took the position that land values had remained static during the years involved and that the subject land should be valued on the basis of $2,500 for each apartment unit that could be built on it. Borough’s expert, on the other hand, placed a value of $3,000 a unit on the property for each of the first three years and $3,500 a unit for 1980.
In support of the proposition that land values had not increased in the years involved, taxpayer’s expert relied upon eight sales, none of which occurred subsequent to 1973. On the other hand, Borough’s expert utilized six sales, three of which were similar to those of taxpayer’s expert, two others which occurred in 1979 and another which occurred in July 1981. In reviewing those sales, all parties agreed on the superiority of location of Colony North which sold during the period 1969-1972 at an average price of $5,366 a unit. The evidence discloses that a comparable site to Colony North, known as the Christian Homes property, was contingently contracted for sale at a price of $10,700 a unit on October 9, 1978. While that sale has yet to be consummated because of the contingencies, it would indicate that property, such as Colony North’s, had at least doubled in value as of 1978. Recognizing that Colony North is far superior to the subject property, it is still an indicator that contrary to the opinion of taxpayer’s expert, land values were rising. This is further supported by the fact that the Lewis House property sold on September 21, 1979 at $4,885 a unit despite the fact that there would be difficulty in constructing an apartment structure on it. Those facts are a sufficient indication to conclude that land values did not remain static as contended by taxpayer’s expert. Borough’s land values will be accepted.
The parties also disagreed on the appropriate capitalization rate. In reviewing those rates, I find that borough’s expert’s effective capitalization rate was much closer to the *573 capitalization rate shown by the ACLI publication detailing capitalization rates for properties which had received financing from life insurance companies during the periods involved. Accordingly, I accept borough’s capitalization rates with the adjustment that the tax rates will be those which were published in the 1980 annual report of the Division of Taxation as table 41 at 218.
The above detailed adjustments result in the following computation of value on the capitalization of income approach for each of the years involved.
1977 1978 1979 1980
Eff. Gross Income $2,856,432 $3,165,973 $3,365,211 $3,438,561
Total Expenses 894,166 1,003,811 1,157,827 1,232,276
Net Income 1,962,266 2,162,162 2,207,384 2,206,285
Land Value 1,521,000 1,521,000 1,521,000 1,774,500
Capitalization Rate 8.5/10.5 9.0/11.0 9.5/11.5 10.0/12.0
Tax Rate 2.47 2.27 2.01 2.17
True Value 15,363,800 16,522,800 16,564,100 15,820,600
Borough’s expert attempted to add to the capitalization of income value by capitalizing uncollected tax surcharges applicable to the years 1977 and 1978. There is doubt as to whether those could be collected in view of the preemption of the rent controls by the federal government in early 1976. Further, at that time the taxpayer was still not rebating amounts due to tenants under the Tenants’ Property Tax Act and it is possible that the rebates would offset the tax surcharges. Accordingly, borough’s expert’s approach in that respect will not be followed.
Borough’s expert also attempted to utilize a replacement cost approach in its efforts to value the property. Other than the use of a base cost per cubic foot in 1954 and bringing that cost up to 1977, there is no detail as to how that value was reached. Further, there is no basis upon which the depreciation claimed could be tested. In this respect, the court agrees with taxpayer’s expert that the reproduction cost approach is not *574 appropriate in valuing properties of the subject type unless they are new.
In utilizing the market approach, borough’s expert relies upon sales of two luxury apartment complexes, which occurred on March 1, 1979 and May 5, 1980. These were the only structures that sold during the period which could be considered ' comparable to the subject property. The Imperial House, a 56-unit luxury apartment building, sold on March 1, 1979 at a sale price of $42,857 a unit. Carriage House, a 292-unit high-rise luxury apartment building, sold on May 5, 1980 at a sale price of $51,382 a unit. Taxpayer objects to the use of these sales as direct evidence for any tax year in which the assessment date was prior to the sale and further, on the ground that the cash value of the sales was substantially less than the stated sales price as the transactions involved below market financing.
The above sales were also used by borough’s expert in a recent case of John F. Inganamort, et al. t/a Mediterranean Towers North v. Boro. of Fort Lee. Docket No. L 1717-77 et al. The parties were the same, counsel were the same and the experts were the same. Testimony and exhibits were virtually identical. Accordingly, following the analysis in the Med North case, the cash values of those sales result in a finding that as of October 1, 1979 the Imperial House sale would reflect a value of $37,000 a unit. The facts show that in order to relate that sale to the subject property, both a 10% downward adjustment with respect to location and a 5% increase with respect to amenities are required. The net effect is that the subject property had an indicated market value on October 1, 1979, of $35,150 a unit or $17,821,000, rounded.
Both the Carriage House sale on May 5, 1980 as well as the sale of the subject property on April 30, 1981 were also analyzed in the Med North opinion for the purpose of adjusting the favorable financing to arrive at the cash values of the sales. Again adopting the analysis in Med North, the cash value of *575 the Carriage House sale on May 5, 1980 was $40,200 a unit and the cash value of the subject property when it sold on April 30, 1981 was $46,000 a unit. Since Carriage House was slightly superior to the subject property and there is a necessary adjustment for time in view of the accelerating activity in the market during that period, it corroborates the suggested market value of the subject property of $35,150 a unit on October 1, 1979. Further, the actual sale of the subject property at a cash value of $46,000 a unit on April 30, 1981, particularly when one views the accelerating prices for the units during this period, again as detailed in Med North, would corroborate a market value of $35,150 on October 1, 1979.
Here again, as in Med North, Borough’s expert attempted to quantify the conversion value of the subject property for all years. Here again, he was unable to do so for the identical reasons detailed in Med North. Accordingly, as in Med North, there was insufficient evidence on which to conclude values based solely on a capitalization of income approach for all years. However, the totality of the evidence shows that there was an additional conversion value inherent in the subject properties which would exceed value based solely on the capitalization of income approach. However, the Borough’s expert was unable to justify his conclusions as to that value through discounts which could not be tested or which were irrelevant because they were based on subsequent events. Further, the subject property had a value, based on the market approach, of $17,821,000 as of October 1, 1979. This market value reflected the conversion element of value.
Based on the capitalization of income approach, the true values of the property for 1977, 1978 and 1979 are $15,-363,800, $16,722,800 and $16,564,100, respectively. Since it is apparent that the market value for 1980, in the amount of $17,821,000 reflected the conversion elements in the property, that value is the true value as of that date.
*576 Taxpayer, prior to the commencement of this trial, moved to have the Freeze Act apply to the judgment entered for the 1977 year. On that basis, the taxpayer would have the same assessment applicable for the years 1978 and 1979.
N.J.S.A. 54:2-43, the Freeze Act, provides as follows:
Where a judgment final has been rendered by the tax court involving real property such judgment shall be conclusive and binding upon the municipal assessor and the taxing district, parties to such proceeding, for the assessment year and for the 2 assessment years succeeding the assessment year covered by the final judgment, except as to changes in the value of the property occurring after the assessment date____
The election to have the Freeze Act apply is solely at the option of the taxpayer. Hasbrouck Heights v. Div. of Tax Appeals, 41 N.J. 492, 197 A.2d 553 (1964). In order to prevent its application in this case, borough had the burden of proving a change in value from the base year. See South Plainfield v. Kentile Floors, Inc., 92 N.J. 483, 457 A.2d 450 (1983). In attempting to meet this burden, borough proved values for the property for the years 1978 and 1979 based on the capitalization of income approach. Those amounts show that the values for 1978 and 1979 were approximately 7.5% higher than the values for 1977. The issue then remains as to what constitutes a change of value for the purpose of negating the application of the Freeze Act.
Taxpayer argues that the change must be substantial and directs the court’s attention to the provisions of Chapter 123 of the Laws of 1973, as amended, which protects assessments if the recomputed assessment falls within a range which is 15% on either side of the original assessment. In effect, taxpayer argues that there should be a 15% change of value before the Freeze Act can be avoided.
In Rothman v. River Edge Bor., 149 N.J.Super. 435, 440, 374 A.2d 36 (App.Div.1977), certif. den. 75 N.J. 19, 379 A.2d 250 (1977), the court indicated that a substantial increase in value negated the effects of the Freeze Act. However, while the application of the 15% test contained in Chapter 123, as *577 advocated by the taxpayer, is appealing, it should be noted that the Legislature specifically provided for such range, while the Freeze Act does not do so. In any event, it is obvious that the change in value should be a meaningful change. This is particularly so, as “[i]t must be remembered that valuation for taxation cannot be dollar precise.” New Brunswick v. Tax Appeals Div., 39 N.J. 537, 550, 189 A.2d 702 (1963). One must also keep in mind that there are periods when real property values are rising at a relatively uniform rate throughout the taxing district and to compare the value of one property with its value in a prior year, without taking such uniform increases of value into consideration, would not coincide with the relief sought to be given to taxpayer through the enactment of the Freeze Act. In this particular case, the values for 1978 and 1979 reflect a 7.5% increase over the base year value. This is to be compared with an 11.8% increase in the C.P.I. from October 1, 1976 to October 1, 1978. C.P.I. Detailed Report, U.S. Dept, of Labor, Bureau of Labor Statistics, Table 13. The record, as a whole, indicates that real property values were increasing during this period and accordingly, the llh% increase in value is not considered a meaningful change in value within the provisions of the Freeze Act. Accordingly, taxpayer’s motion to apply the Freeze Act to the tax years 1978 and 1979 is granted.
The Clerk of the Tax Court will enter a judgment to the effect that the assessed value for the property for 1977 is $15,363,800 and, pursuant to the Freeze Act, that assessment will be made applicable to the tax years 1978 and 1979. The land portion of said assessment will be $1,521,000. Since the market approach value did reflect the conversion element of value, it is deemed the appropriate approach for 1980. The true value for 1980 is $17,821,000 with the land portion valued at $1,774,500.
The Clerk of the Tax Court will enter judgments to the above effect.