EVERS, J.T.C.
The principal issue presented in this matter is whether any change in value of property is sufficient to prevent the application of N.J.S.A. 54:51A-8 (freeze act). In the instant matter taxpayer, owner of premises known as Block 3403, Lot 3, seeks to apply the freeze to 1982 and 1983 on the basis of the 1981 Tax Court judgment. The application is opposed by the borough on the basis that the property has undergone a change in value following the 1981 (base year) assessment date. Follow *531 ing a trial on the merits in the 1981 matter the court found a true value of $8,750,00o.[1]
The property consists of a 19-story reinforced concrete apartment building containing 306 one-bedroom units, constructed in 1978-1979. The property was designed for senior citizen occupancy and constructed pursuant to section eight of the National Housing Act. In addition to affording favorable financing for the construction of the building the act also requires the government to subsidize the rents paid by the senior citizen occupants. The property is not subject to the borough’s rent control ordinance which is superseded by the federal regulations covering section eight of the National Housing Act.
In addition to oral argument in connection with the freeze application the court also heard limited testimony from a qualified appraiser, who had also testified in the 1981 trial, on behalf of the borough. No testimony was offered by taxpayer. According to borough’s expert, because (1) the total income including the government subsidies increased over the 1981 income by $122,693 and $223,659 in 1982 and 1983 respectively; (2) the expense increase from year to year was proportionately less than the increase in income; and (3) the rate of capitalization (except for minimal changes in the effective tax rates) remained constant for the three years, the value increase prohibited the application of the freeze.[2]
The purpose of the hearing being only to determine whether there was a change in value the expert did not testify as to a specific conclusion of value. However, an extension of his testimony concerning net operating income and his rates of *532 capitalization results in a true value of $10,233,605 for 1982 and $10,643,795 for 1983.[3]
While it is not the court’s duty to ascertain a specific value for each freeze year, in order to determine, in general, whether a change thereof does exist, it is necessary to at least summarily review the expert’s analysis.[4] In doing so I note that his expense allowances did not include a reserve for replacement. It is beyond question that proper appraisal technique requires a deduction for such reserve even if, in fact, the taxpayer has made no such provision. The American Institute of Real Estate Appraisers, The Appraisal Of Real Estate, (8 ed. 1983) at 368-369. The alternative to providing for a replacement reserve is to deduct the full amount of such expense in the year of replacement as a repair and maintenance expense. The magnitude of such an expense, (such as for a roof and/or parking lot) would indeed do violence to stability in taxation as assessments would, of necessity, vary considerably from year to year. See Hackensack Water Co. v. Tax Appeals Div., 2 N.J. 157, 65 A.2d 828 (1949) and In re Erie RR. System, 19 N.J. 110, 115 A.2d 89 (1955). For the same reasons the amount of reserve should not vary constantly, at least to any great extent, from year to year. Thus, I have not considered taxpayer’s representations that HUD required a reserve for replacement of $91,135 (4.9% of total expenses) in 1982 and $205,912 (10.4% of expenses) in 1983, which represent a striking departure from 2% which appears to be average. See Brunetti v. Clifton, 7 N.J.Tax 161 (Tax Ct.1984); Inwood at Great Notch v. Little Falls Tp., 6 N.J. Tax 316 (Tax Ct.1984); Jefferson House Investment Co. v. Chatham, 4 N.J.Tax 669 (Tax Ct.1982); Highview Estates v. Englewood Cliffs Bor., 6 N.J.Tax 194, 207 (Tax *533 Ct.1983). However, noting the fact that the subject is a senior-citizen complex which receives the benefit of subsidized rents from the federal government I do accept the fact that HUD regulations concerning reserves may be more demanding than the rate found in the market place and thus for purposes of this determination, I conclude that a 4% reserve is reasonable. Allowing for this adjustment taxpayer’s net operating income is $1,304,668 in 1982 and $1,349,668 in 1983.
Concerning a rate of capitalization, in the 1981 opinion, following an analysis of mortgage interest rates and rates of return on alternative investments, the court found a base rate of 12%, (exclusive of a tax factor) to be fair and reasonable. The court further stated:
Taxpayer’s witness urges the court to accept its base rate of 12.5% due to the lack of guarantee that the government will continue its program of subsidizing the rental payments in this senior citizen complex. He also pointed out that an investor is confronted with a limited yield on his investment because of the fixed rate of return allowed by the federal government; an unenviable position, according to the witness, in an inflationary economy. Be that as it may, I do not share taxpayer’s concerns. Despite the fact that the United States Congress is called on, in connection with the budget process, to allocate the rent supplement payments on an annual basis, I perceive no danger that the program will be abandoned or substantially undercut. Nothing in the record nor in the history of the program itself remotely suggests that taxpayer’s fears will be realized. To the contrary it is far more reasonable to conclude that the federal assistance will continue for the 40 year life of the mortgage, thereby increasing, on a long term basis, the quality of the income stream. I further note that as a result of the government’s subsidization of rents, there are virtually no vacancies in this complex; in fact there is a substantial waiting list of potential tenants.
Based on this record I find that the same situation obtained during 1982 and 1983. Taxpayer seized on the court’s statement in the 1981 opinion wherein it was noted that during the period in question both interest and capitalization rates were rapidly escalating. That statement was taken out of context. It was followed by:
However, as this court stated in Berkley Arms v. Hackensack, 6 N.J.Tax 260 (Tax Ct.1984):
As in the case of forecasting the weather, forecasting interest rates is also very unpredictable. Thus, in view of the need for stability in taxation, our cases uniformly hold that the true value of realty must be fairly constant and must be gauged by conditions not temporary and extraordinary but by those *534 which over a period of time will be regarded as measurably stable, [citations omitted] In Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 163 [65 A.2d 828] (1949) it was said that value for purposes of taxation has a measure of permanency which renders it secure against temporary inflation or deflation. In New Brunswick v. State of N.J. Div. of Tax Appeals [39 N.J. 537, 189 A.2d 702 (1963) ], supra, it ws said that the rate of return should reflect conditions for a reasonable span of years. In Murnick v. Asbury Park, 2 N.J.Tax 168 (Tax Ct.1981), reversed on other grounds, 95 N.J. 452 [471 A.2d 1196] (1984) it was stated that the assessment process cannot be so acutely sensitive to rates of return available to money markets to require an assessor to adjust his assessment roles to yearly fluctuations.
Accordingly, nothing of any substance to the contrary having been brought to my attention, it is reasonably concluded that an investor in this property would seek no more than a base rate of return of 12% in 1982 and 1983. Applying those rates plus a tax factor to the adjusted net operating income results in a conclusion that the property would have a true value in the range of $9,325,700 in 1982 and $9,702,860 in 1983. . These values are approximately 6.5% and 10.9% greater respectively than the value found for 1981.
The freeze act states that a final judgment shall be conclusive and binding on the assessor and taxing district for the year in question, (base year) and the two succeeding years, (freeze years). The act further provides, however, that the assessment (pursuant to the base year judgment) is not frozen when there is a change in value or when a revaluation is effective. Admittedly, no revaluation was effective for either freeze year. However, the court has determined that the property did undergo a change in value during each freeze year. The question presented, therefore, is whether any change in value of the subject property prohibits the application of the provisions of the freeze act.
Taxpayer argues that the freeze applies unless the borough is able to prove a “substantial” change in value. In support of that theory taxpayer refers to South Plainfield v. Kentile Floors, Inc., 92 N.J. 483, 457 A.2d 450 (1983) and Eckardt v. Sisler Enterprises, 1 N.J.Tax 25 (Tax Ct.1980). A review of those opinions reveals that the degree of change of value required to avoid the freeze was never discussed. Tax *535 payer also refers to Union Terminal Cold Storage Co. v. Spence, 17 N.J. 162, 110 A.2d 110 (1954) where the parties stipulated that there was no change in value, that matter dealing only with the procedural requirements necessary to invoke the freeze. Although the Appellate Division in Rothman v. River Edge Bor., 149 N.J.Super. 435, 374 A.2d 36 (1977) and the Tax Court in Hudson Terrace Ap’ts. v. Fort Lee, 2 N.J.Tax 457 (Tax Court 1981) may have impliedly suggested that such increases in value must be substantial, I have been referred to no case clearly standing for that proposition.
In attempting to resolve the question as to what was meant by change in value, the purpose of the freeze act must be kept in mind. The classic statement of the obvious legislative purpose is found in Newark v. Fischer, 8 N.J. 191, 84 A.2d 547 (1951):
The evil which the “freeze” statute sought to remedy was repeated, yearly increases in the assessment value of properly, not related to or justified by the changes increasing its market value, and resulting in harassment of taxpayer, subjecting him to the trouble and expense of annual appeals to the county tax board. [At 199, 84 A.2d 547; emphasis supplied],
While I do not subscribe to taxpayer’s theory that a change in value must be substantial, 1 do agree that the Legislature did not intend that any change, no matter how slight, would work to avoid the freeze. The use of “any change” as a standard could render the freeze act virtually useless and would clearly defeat its purpose, for rarely, if ever, does a property, and particularly an investment property, not undergo a change in value from year to year.
What then is the standard to be used in determining whether a change in value defeats the application of the freeze? In searching for that answer we are guided by the fact that the change must be in the true value and not in the assessed value of the property. Thus in International Fastener Research Corp. v. Kearny, 2 N.J.Tax 494 (Tax Ct.1981) the court rejected Kearny’s contention that changes in the chapter 123 ratios (N.J. S.A. 54:51A-6) would defeat the freeze. Also, as previously noted, tax assessments must have a measure of permanency. *536 Hackensack Water Co. v. Tax Appeals Div., supra. And, valuation for taxation cannot be dollar-precise. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963). Further, in Murnick v. Asbury Park, 2 N.J.Tax 168 (Tax Ct.1981), rev’d. on other grounds, 95 N.J. 452, 471 A.2d 1196 (1984), it was said:
The assessment process cannot be so acutely sensitive to rates of return available in money markets to require an assessor to adjust his assessment roles to yearly fluctuations. [At 188]
A taxing district cannot have it both ways. It cannot defend its assessments through the use of a Murnick umbrella on the one hand and, on the other, ignore the Murnick protections in attempting to defeat a taxpayer’s application for the freeze. Lastly, and perhaps most importantly, we are guided by the legislative purpose in adopting the freeze act as expressed in Newark v. Fischer, supra.
Clearly the above enumerated principles support the proposition that whether the change in value standard contemplated by the freeze act is met depends on the facts of each case. Standing alone the probable increase in value, as previously determined, ($575,700 in 1982 and $952,900 in 1983) may easily be termed substantial and yet, depending on the circumstances surrounding the matter, may be less than what is required to defeat the application of the freeze act.
While admitting to an increase in value, taxpayer claims that when compared to the increase in the Consumer Price Index (CPI) during 1982 and 1983 such increases were not sufficient to avoid the freeze. In urging the court to adopt the consumer price indices as a yardstick taxpayer relies on Inganamort Bros. & LaSala Bros., t/a Mediterranean Towers West v. Fort Lee Bor., 7 N.J.Tax 564 (Tax Ct.1984), aff’d 202 N.J.Super. 87, 493 A.2d 1304 (App.Div.1985) where it was said:
In this particular case, the values for 1978 and 1979 reflect a 7.5% increase over the base year value. This is to be compared with an 11.8% increase in the C.P.I. from October 1, 1976 to October 1, 1978. C.P.I. Detailed Report, U.S. Dept, of Labor, Bureau of Labor Statistics, Table 13. The record, as a whole, indicates that real property values were increasing during this period and accordingly, the 7'/2% increase in value is not considered a meaningful change in *537 value within the provisions of the Freeze Act. Accordingly, taxpayer’s motion to apply the Freeze Act to the tax years 1978 and 1979 is granted, [at —]
In so relying, taxpayer improperly concluded that the CPI was the basis of the court’s conclusion that there was no change in value within the provisions of the freeze act. The full quotation shows that while the CPI was used to illustrate the inflation rates during the period, the court relied upon the record, as a whole, to support the finding that real property values were increasing during the freeze period.
The CPI measures the average changes in prices of goods and services bought by wage earners and clerical workers, including families and single persons. It is prepared by the Bureau of Labor Statistics of the United States Department of Labor from extensive data collected on a national basis, is systematized and published for general distribution and is kept as a record of the bureau. The CPI does not reflect changes in real property values but rather it shows the increases of various goods and services purchased by the average consumer. While the CPI, in a general sense, may have some value in considering the “cost of living” I find that index to be too broad, too encompassing to be a true barometer of increases in real property values in a given municipality for purposes of a freeze act application. As has been said in the valuation of real property for local taxation, the search is for the fair value of property. New Brunswick v. Tax Appeals Div., supra.
 I find a better method to gauge the changes in value is to examine the rise and/or fall of real property values in the specific market place in which the subject property is located. This is accomplished through a review of the Division of Taxation Director’s determination of average ratios for each taxing district which is published yearly pursuant to N.J.S.A. 54:1-35.1 et seq.
Those determinations are based on the market activities of the buyers and sellers of real property. While the ratios developed through the Director’s study are employed in connection with the application of chapter 123 and for school aid *538 purposes, they also indicate the changes in property values in each taxing district. For example, a revaluation having been effective in Fort Lee in 1980, all assessments were at 100% of true value. That 100% ratio decreased to 95% in 1981, 91% in 1982 and 82% in 1983. Thus while the assessments remained unchanged the value of properties in the borough increased at the rate of 5% in 1981 (over the 1980 values), 4.2% from 1981 to 1982 and 9.9% from 1982 to 1983. The increase as to the two freeze years (1982 and 1983) over the base year (1981) was 13.68% or an average of 6.8% a year. Based on the prior findings of value wherein the rate of increase in value (over 1981) was 6.5% in 1982 and 10.9% in 1983 it is seen that such increases in value were in the general range of real property value increases in the borough. Those increases, although substantial in terms of dollars, are not deemed to be a “change in value” in the context of the freeze act.
A contrary finding would, in effect, discriminate against those taxpayers who, having proved that an assessment was too high in one year, would nevertheless be forced to either relitigate the value in the next two years, or accept the original base year assessment, even though the increase in value during the freeze years was no greater than the increase in value of all other properties. As previously noted, to force a taxpayer to make that choice, is contrary to the intent and purpose of the freeze statute.
In finding that the taxpayer is entitled to the benefits of the freeze act the court is not suggesting that the formula employed herein is inexorable for all cases. However, the language of Chief Justice Weintraub in In re Appeals of Kents, 34 N.J. 21, 166 A.2d 763 (1961), in which he solved the dilemma theretofore confronting taxpayers who, having proved discriminatory assessments were nevertheless without a remedy, by applying the average ratio to true value, is appropriate here. He said, “[U]ntil some better technique appears or some other suitable one is provided by statute, we are satisfied to utilize the average ratio in cases such as the one before us.” Id. at 33, 166 A.2d 763.
*539 The Clerk of the Tax Court is hereby directed to enter judgment for 1982 and 1983 pursuant to the freeze act on the basis of the 1981 judgment, to wit:
1982 and 1983
Land $1,745,625
Improvement 6,566,875
Total $8,312,500

In the 1981 matter there was no testimony regarding income and expense as the parties stipulated to the net operating income.

 The expert's capitalization rate consisted of a 9.5% return on and a 2.5% return of investment plus the effective tax rates in each year. The income and expenses utilized by the expert were those reported by taxpayer to HUD.

 While in many freeze act applications a plenary hearing may not be required, because of the nature of this property, in its discretion the court allowed limited testimony.