ANDREW, J. T. C.
In this local property tax proceeding, plaintiff-taxpayer seeks a reduction in its assessment for the tax years of 1976, 1977, 1978 and 1979. Plaintiff urges that its local property tax assessment is incorrect not only because it is in excess of fair market value but also because it is at a level or ratio to true value higher than the common level of assessments within the taxing district.
The subject property is identified as three separate parcels on the tax map of the taxing district. These are Block 449G, Lots 4, 4A and 4B. The assessments for 1976 and 1977, which were affirmed by the Middlesex County Board of Taxation, were as follows:
Block 449G, Lot 4
Land $ 93,900
Improvements 2,910,200
Total $3,004,100
Block 449G, Lot 4A
Land $ 103,600
Improvements 2.780,000
Total $2,883,600
Block 449G, Lot 4B
Land $ 207,000
Improvements 4,677,000
Total $4,884,000
*191 Sayreville conducted a revaluation which was made effective for 1978. As a result of the revaluation the assessments for 1978 and 1979, which were affirmed by the county board, were as follows:
Block 449G, Lot 4
Land $ 720,000
Improvements 3.397.000
Total $4,117,000
Block 449G, Lot 4A
Land $ 672,000
Improvements 3,173.500
Total $3,845,500
Block 449G, Lot 4B
Land $1,128,000
Improvements 5,026.500
Total $6,154,500
At the outset of the trial it was understood that the three lots constituted a single economic unit and therefore would be valued as one parcel. The expert appraiser for each party estimated value in this manner.
For convenience, then, the assessments were considered in combination as follows:
1976-1977
Land $ 404,500
Improvements 10.367,200
Total $10,771,700
1978-1979
Land $ 2,520,000
Improvements 11.597.000
Total $14,117,000
The subject of this litigation is a garden apartment complex consisting of 840 units. This complex is located on Ernston Road near State Highway Route 9 in Sayreville. The site contains approximately 44 acres.
The improvements, approximately 15 years old, consist of 200 two-bedroom and 640 one-bedroom apartments. Every apart *192 ment has a refrigerator, electric range and air conditioner. There are no garages but ample open parking exists. Also located on the site is a swimming pool and laundry equipment available on a concession basis. It was indicated by both parties that the improvements are in an overall good condition and are well maintained.
Sayreville does have a rent control ordinance and during the tax years involved in this matter rental increases were limited to one-half of the percentage increase in the Consumer Price Index up to a maximum of 5% annually. The percentage increase did exceed 5% in one year, and for that year, pursuant to the rent control ordinance, vacancy decontrol was in effect.
There was no dispute as to the value of the land. Taxpayer’s expert accepted the land value established during the revaluation year of 1978 as accurately reflecting the land value for all tax years involved in this proceeding. As indicated by taxpayer’s expert, the overall land valuation of $2,520,000 represented $3,000 per unit ($3,000 X 840 = $2,520,000), which he felt was an accurate estimation of value. This land value was. not questioned by the taxing district; its expert did not even attempt to value the land separately. Therefore, I will accept the value of $2,520,000 as constituting land value for all tax years involved. See Middlesex Builders v. Old Bridge Tp., 1 N.J.Tax 305, 308 (Tax Ct.1980); Fourth Fairland, Inc. v. Hazlet Tp., 1 N.J.Tax 254, 263 (Tax Ct.1980).
Valuation
Each party relied upon the testimony of one expert to establish the value of the subject. Both experts offered their opinions of value based exclusively on the income approach to valuation. Taxpayer’s expert estimated the value of the subject for each tax year. His values were $10,200,000 for 1976, $10,-400,000 for 1977, $10,250,000 for 1978 and $10,200,000 for 1979. Borough’s expert, contrary to N.J.S.A. 54:4-23, did not estimate value as of October 1 of each pretax year but instead valued the subject as of December 31, 1978 at $12,639,000. Because the expert did not explain the use of this valuation date, this court *193 can only surmise that this value estimate represented value for the tax year 1979. He stated that he could not conclude a value for the prior years of 1976, 1977 and 1978 because he did not “have any of the pertinent data” for those years.
Therefore, this court is required to determine the proper valuation of the subject based solely on the value estimates submitted by plaintiff for each tax year, with supporting data and a value estimate submitted by defendant for the nonassessment date of December 31, 1978 (presumably for tax year 1979) and the data submitted in support of such value estimation.
As previously stated, taxpayer’s expert relied exclusively on an economic approach for his value conclusion. For all of the years under consideration, he calculated the gross rent potential as of October 1 of each year preceding the tax year. He estimated and deducted a vacancy and collection loss factor of 2Wo to which he added the actual receipts for laundry commissions, the pool and miscellaneous income.
Utilizing stabilized and actual expenses for each of the tax years, he estimated total expenses of 32.1% of gross income for 1976, 32.2% for 1977, 35.2% for 1978 and 35.5% for 1979. The deduction of these expenses yielded net operating incomes of $1,346,400 for 1976, $1,402,737 for 1977, $1,395,019 for 1978 and $1,443,097 for 1979. Taxpayer’s expert then applied a building residual method to arrive at the heretofore-stated values of $10,200,000 for 1976, $10,400,000 for 1977, $10,250,000 for 1978 and $10,200,000 for 1979. His capitalization rate for 1976 consisted of an 8.5% interest rate, a 3% recapture rate and an effective tax rate of 2.43%, for a total rate of 13.93%. His capitalization rate changed in 1977 and 1978 to a total rate of 14.23%, which reflected his opinion that the return on investment should be 9% and the change in the effective tax rate. For 1979, the return on investment rate was increased to 9.5%. Considering this change and the difference in the effective tax rate, taxpayer’s expert utilized a total 1979 rate of 14.91%.
Borough’s expert began his economic analysis with an average of the actual gross receipts of the taxpayer for the years of *194 1976, 1977 and 1978. No vacancy factor was used because he used actual receipts as opposed to potential gross rent. Thereafter, he deducted expenses of 32.41% based on actual expense figures incurred by the taxpayer, which the expert stabilized by considering what he felt were reasonable allowances and using income and expense analyses for apartments in general provided by the Institute of Real Estate Management as a check. The expert then applied a total capitalization rate of 11.6548% to arrive at his estimated value of $12,639,000. The overall rate of 9.5948% was derived from a mortgage equity technique which was added to an effective tax rate of 2.06% to provide the total rate utilized to provide a value conclusion. The effective tax rate as used by the expert was provided to him by the assessor of the borough.
There were only three areas in which the two appraisers differed in their income analysis. Initially, taxpayer’s expert estimated an effective gross income while borough’s expert relied upon an average of actual receipts for the years of 1977, 1978 and 1979 to provide an estimate of effective gross income.
I find that the use by taxpayer’s expert of a reconstructed operating statement for each tax year under consideration is more indicative of what a prospective purchaser would do as to each of the relevant assessment dates. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 545, 189 A.2d 702 (1963). In this regard it must be noted that borough’s expert offered nothing with regard to the tax years of 1976, 1977 and 1978. I further find that the estimated income advanced by taxpayer’s expert was adequately supported by the actual receipts in each pretax year. The actual receipts demonstrate that income attributable to a percentage of the interest income derived from security deposits which the taxpayer is permitted to retain for administration purposes would be accounted for through the use of a minimal vacancy and collection loss factor.
The next area of divergence was with regard to the allowance of expenses. I find that taxpayer’s expert presented a more persuasive and cogent analysis of the expenses. However, that *195 is not to say that I accept his determination in its entirety. See Samuel Hird and Sons, Inc. v. Garfield, 87 N.J.Super. 65, 73-74, 208 A.2d 153 (App.Div.1965); Lamm Associates v. West Caldwell, 1 N.J.Tax 373, 387 (Tax Ct. 1980); Niktan Realty Co. v. Passaic, 1 N.J.Tax 393, 402 (Tax Ct. 1980).
Taxpayer’s expert allowed for the wages of a renting agent and an office clerk in addition to a stabilized allowance of 4% for management. I find that such salaries should be subsumed within the allowance for management. To permit a stabilized allowance and the actual wages paid for these managerial positions imposes a duplicative penalty. These salaries were $15,860 for 1976, $16,380 for 1977, $16,900 for 1978 and $17,420 for 1979. See Murnick v. Asbury Park, 2 N.J.Tax 168, 182-184 (Tax Ct. 1980). The record does not indicate that there is a duplication relative to the other salaried employees.
Both experts used a stabilized allowance for repairs and maintenance. However, taxpayer’s expert also allowed for the estimated cost of painting in the amount of $43,480 for each year. I find that the actual expenses incurred support the conclusion that painting should be included within the stabilized allowance for maintenance and repairs. Id. at 184-186. Therefore, the separate expense for painting will not be allowed.
The final item relative to expenses that merits attention involves the allowance for management. Taxpayer’s expert allowed 4% of gross rent potential for this expense. However, management fees are normally based on a percentage of effective gross income. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), 350. The rationale is that the fee is bottomed on the rents actually collected and not on the total rent potential. The claim by taxpayer’s expert that the advertising expense justifies a percentage of gross rent potential is not supported in a municipality with a restrictive rent control ordinance. I will disallow that portion of the management expense that exceeds 4% of effective gross income. This amounts to $2,045 in 1976, $2,127 in 1977, $2,225 in 1978 and $2,313 in 1979.
*196 Therefore, I will adopt the expense estimates advanced by taxpayer’s expert less a deduction for the total of the items heretofore mentioned which are not acceptable. These items total $61,385 for 1976, $61,987 for 1977, $62,605 for 1978 and $63,213 for 1979.
The last area in which the experts differed was with regard to the capitalization rate and technique to be utilized. Taxpayer’s expert relied primarily upon a building residual technique and supported the conclusion obtained thereby with a modified band of investment method of deriving an overall capitalization rate. Borough’s expert relied exclusively upon the mortgage equity technique. He found support for the mortgage portion in tables supplied by the American Council of Life Insurance. He then estimated a return on equity based on data he had seen relative to various apartment buildings and utilized a holding period based on his consideration of income tax and depreciation benefits. This court has on a number of previous occasions rejected the conclusion obtained through the mortgage equity technique. Middlesex Builders v. Old Bridge Twp., 1 N.J.Tax 305, 311-313 (Tax Ct. 1980); Murnick v. Asbury Park, 2 N.J.Tax 168, 186-188 (Tax Ct. 1980); Petrizzo v. Edgewater, 2 N.J.Tax 197, 203-204 (Tax Ct. 1980). These cases made it clear, however, that the rejection was not of the technique itself but of the conclusion obtained because of the failure to provide adequate supporting data for the method. Such an analysis is required not only of the mortgage equity procedure but of any standard appraisal methodology. This court is bound by the constraints of the record produced. Even if the court independently believed that the mortgage equity technique provided the most accurate method of deriving a capitalization rate, it could not go beyond the evidence adduced at a hearing in order to arrive at market value. State v. LiButti, 146 N.J.Super. 565, 370 A.2d 486 (App.Div. 1977); Giordano v. Newark, 2 N.J. 585, 589, 67 A.2d 454 (1949).
As in Middlesex Builders, Murnick, and Petrizzo, all supra, this court is again confronted with a capitalization rate that *197 has very little support in the record. Here, too, I find that the rate must be rejected for lack of factual justification and not because it was derived by means of an inappropriate technique.
Taxpayer’s expert indicated that the basis for his capitalization rate was an analysis of comparable investments and the risk involved in the ownership of income producing property. He based his return on investment of 8.5% in 1976, 9% in 1977 and 1978 and 9.5% in 1979 on what he considered to be a safe rate of return. His allowance for recapture was 3% for all tax years and was based on the risks involved in ownership of a garden apartment complex such as the subject. He also considered the recapture allowance in terms of a 33-year remaining economic life of the property although he preferred to consider recapture as the additional return necessary to attract a potential investor.
Based on the record I find that a rate of 11.5% (9% return and 2.5% recapture) reflects what an hypothetical investor would demand of a long-term investment in the subject. I am mindful that taxpayer’s expert used a return of 8.5% for 1976 and 9.5% for 1979, but it is felt that in the interest of stability the return should be 9% for all years. Murnick v. Asbury Park, supra 2 N.J.Tax at 188. I find that 2.5% better reflects the remaining economic life of the subject, considering its age, condition and level of maintenance. This finding also includes a judgmental consideration of the additional risk rate or surcharge that a prospective purchaser would want in order to be attracted to an investment in the subject.
The last item in the capitalization rate of taxpayer’s expert was the effective tax rate. He modified the actual tax rate in the years following 1976 because of the application of the Tenants’ Property Tax Rebate Act, N.J.S.A. 54:4-6.2 et seq., which requires the owner of a multifamily dwelling to refund to the tenants 65% of the tax savings resulting from a reduction in the actual tax rate. I find that his calculations to adjust the actual tax rate for the tenant rebate were proper and correct. In addition, instead of treating the rebate as an expense, his modification of the tax rate is consistent with New Brunswick v. *198 Tax Appeals Div., 39 N.J. 537 189 A.2d 702 (1963). See 1 Bonbright, Valuation of Property, 257-258 (1937).
The question of whether the tax rate as adjusted by taxpayer’s expert is to be applied or whether a further adjustment must be made depends on the resolution of the claim of discrimination. Fort Lee v. Hudson Terrace Ap’ts, 175 N.J.Super. 221, 237, 417 A.2d 1124 (App.Div. 1980).
During the course of direct examination, taxpayer’s expert made the necessary changes in effective tax rates and the ratios to be applied to true value to demonstrate his belief, at the time of trial, that the unweighted unclassified ratios were better determinants of the common level of assessment in the borough. His conclusions were derived from 197 usable sales in 1976 (6 in class 1, 184 in class 2, and 7 in class 4), 212 usable sales in 1977 (10 in class 1,194 in class 2, and 8 in class 4) and 288 usable sales in 1979 (13 in class 1, 271 in class 2, and 4 in class 4). See Gaynes v. Edison Tp., 179 N.J.Super. 373, 2 N.J.Tax 500, 432 A.2d 127 (Tax Ct. 1980), for a discussion of the process by which the unweighted unclassified ratios are obtained.
His ratio study also indicated the range of ratios for each year and the coefficients of deviation, general, stratified and segmented. The general coefficients were 16.35 for 1976, 15.19 for 1977 and 13.40 for 1979.
Discrimination
The record in this matter reveals that taxpayer’s expert was of the opinion that the common level of assessment in the taxing district for each of the tax years 1976, 1977 and 1979 was reflected by the unweighted, unclassified ratio which he developed from a sales-assessment study.[1] His appraisal report, however, indicated that a proper assessment could also be reached via an application of the sales-assessment ratios promulgated by the Director of the Division of Taxation for each of the *199 tax years 1976, 1977 and 1979. His appraisal report reflected the use of the Director’s ratios to formulate effective tax rates for the years in which discrimination was at issue.
Borough offered no affirmative proof on the issue of discrimination in assessment. The only witness for borough was an appraiser who testified solely as to true value. The effective tax rate utilized by borough’s expert was provided by the assessor of the borough. This rate did not indicate a ratio or common level in the borough below 100%. Hence there was no admission by borough that the property should be assessed at less than true value.
In order to be entitled to relief from a discriminatory assessment a taxpayer must be able to demonstrate,
... (1) that the real property generally in the municipality was assessed at less than true value; (2) what the common assessment level was, and (3) the true value of the subject property upon which the common level percentage would operate, (citations omitted) If there is no common level shown and there is none which the assessor is endeavoring to apply, and the assessment is substantially higher than the “average ratio” determined by the Director of Taxation, the “average ratio” may be applied under Kents, and the assessment reduced by that proportion. [Continental Paper Co. v. Ridgefield Park Vil, 122 N.J.Super. 446, 450-451, 300 A.2d 850 (App.Div. 1973)].
In Continental Paper Co. discrimination relief was denied because there was no evidential foundation in the record to support a finding of a common level of assessment, nor was there a showing that there was no common level, in which event the Director’s ratio could be enlisted. Ibid. The court repeated the admonition of our Supreme Court in In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961), wherein then Chief Justice Weintraub said:
Where, as here, the record of sales indicates there is no common level for all or any class of real property and the assessors disavow any effort to achieve one, the average ratio should be deemed sufficient evidence of the level to which reduction should be granted in the absence of circumstances indicating that the average should be modified for that purpose. The trier of the facts may properly consider any weakness which may appear as, for example, a paucity of sales in the municipality concerned or some imbalance caused by unusual experience (at 31) (emphasis supplied). [Continental Paper Co. v. Ridgefield Park Vil., supra 122 N.J.Super. at 454, 300 A.2d 850]
*200 The Continental Paper Co. court was very much concerned with the inadequacy of proof in denying the requested discrimination relief. This concern was also raised in Tri-Terminai Corp. v. Edgewater, 68 N.J. 405, 346 A.2d 396 (1975), wherein discrimination relief was also denied. Our Supreme Court pointed to the fact that the number of usable sales in the Director’s assessment-sales ratio studies was a limited sampling.
In the latest reported pronouncement on this subject the Appellate Division, in denying discrimination relief for failure of proof, cited the fact that the 77 sales used to demonstrate inequality in assessment represented only a miniscule portion (1.8%) of a total of 4,269 assessed parcels. Fort Lee v. Hudson Terrace Ap’ts, 175 N.J.Super. 221, 235-236, 417 A.2d 1124 (App. Div. 1980).
In borough’s cross-examination of taxpayer’s expert the issue of sufficiency of proof to support a conclusion that a common level of assessment does exist was crystalized. What is a sufficient number of sales to support a conclusion that a common level of assessment does in fact exist or that there is clearly an absence of a common level? Must there be a specific number of sales or must sales bear a certain relationship to the total number of assessable line items within a taxing district? Can this court arrive at a determination based solely on a particular number of sales in a concededly inflationary economy? These questions cannot be answered in this particular case. I find that I cannot determine whether the sales ratio study performed by taxpayer’s expert does in fact support his conclusion that a common level did exist at the level of the unweighted unclassified ratios for each of the tax years of 1976, 1977 and 1979. A portion of the cross-examination is illustrative of this court’s determination of a failure of proof:
Q. Can you tell me how many line items there are in in the Borough of Sayreville, taxwise?
A. No, I can’t.
Q. Can you tell us the same thing for what eight sales would represent against the total—
A. No.
*201 Q. —three sales—
A. Sorry.
Q. —four or five. You would not be able to do that. I take it from the testimony you gave about the clustering and the opinion that you ultimately rendered that you had some background in statistics.
A. Correct.
Q. In fact, some background and some knowledge of statistics would have been necessary to—
A. I believe so.
Q. —to premise any conclusion, if you were to have that conclusion testified to?
A. Yes.
Q. When does a statistical figure — talking in terms of co-efficient of deviation or some such terminology. When does a sample become — a percentage — become so small that its effect becomes diminutive, becomes so negligible that it really can’t be considered?
A. I really can’t say. The testimony can be weighted by the number of sales. Ten sales could be indicative of a trend in the community. A hundred sales could be indicative. It could be 1%; it could be 5%. I really can’t indicate whether there are a number of sales substantial. I have done many sales ratio studies for communities fairly representative — same size as Sayreville. I’m not surprised to see the number of sales. They seem to be general, two to three hundred per year is quite common.
Q. And the general size of Sayreville, if you’re so familiar with it — how many line items would a town the general size of Sayreville have? Ten thousand?
A. I doubt if it would be as high as 10,000.
Q. 9,000?
A. I really don’t know.
Q. Well, for the size of Sayreville, you mean just general populationwise; it that correct? The size of Sayreville, that’s what your experience has been statistically?
A. I don’t really know the population. I don’t know the number of line items. I just know, basically, the area by my own inspections but—
Q. With all deference, how do you presume to tell us that two to three hundred sales is average for the Borough of Sayreville if you neither know the number of line items or the population? How can you do that?
A. I’m only stating from the general size of the community and the area.
Q. What’s the general size?
A. I don’t know the specifics. I know in travelling the community — Sayreville is certainly not Woodbridge. It is certainly not as large a community as some or as small as many. I’m only making a judgment, and I can’t base it on any statistics unfortunately.
Q. We are not as large as New York, and we are not as small as Helmetta; but we are somewhere, Mr..... And I’m just perplexed by how you can testify as to a statistic and its significance if you have nothing to compare it to. You have no frame of reference. So it is fair to say that you do not know what the population of Sayreville is?
*202 A. Absolutely correct.
Q. And you do not know the number of line items?
A. That’s correct.
Q. You do not know the number of residences in the town?
A. That’s correct.
This court is not in a position to determine if the number of sales cited by the taxpayer’s expert is sufficient to conclude that a common level did exist in Sayreville without some factual support. Perhaps this number could be expressed as a percentage of total items necessary to make a statistical inference from a sample, or as a single number of sales from which a factfinder could make a statistical inference that the great bulk of properties within a taxing district are indeed being assessed at a particular level or that the assessing process is haphazard as in Kents, supra.
I find, based on the evidence in the record, that plaintiff failed to prove that a common level did exist in Sayreville during the tax years of 1976, 1977 and 1979. This failure of proof rests on an inadequate and incomplete analysis of the sales in the taxing district and the resulting failure to demonstrate the presence or absence of a common level of assessment. Taxpayer has not demonstrated that it is shouldering more than its proportionate share of the total tax burden. In re Appeals of Kents, supra.
In 1979 the fact that N.J.S.A. 54:2-40.4, commonly known as chapter 123, was in effect does not assist plaintiff. Chapter 123 presumptively establishes a common level for the taxing district of 102% for 1979. Hence, no discrimination relief can be afforded by means of this legislative remedy to inequality in assessment. N.J.S.A. 54:2-40.4.
Therefore, discrimination relief is denied and the computation of the tax rate for inclusion in the capitalization rate will be limited to the actual tax rate as affected by the Tenant’s Property Tax Rebate Act. N.J.S.A. 54:4-6.2 et seq.
Pursuant to the foregoing, I have determined by means of an economic analysis that the true value of the subject property is as follows:
*203 1976
Effective gross income $ 2,008,325
Less operating expenses 600,540
Net operating income $ 1,407,785
Deduct income to land ($2,520,000 x 12.30%)
(9% return + 3.30% actual tax rate) 309,960
Net income to improvements $ 1,097,825
$1,097,825 capitalized at 14.8%
(9% return, 2.5% recapture 3.3% actual tax rate) (rounded) 7,417,700
Add value of land 2.520,000
Value $ 9,937,700
1977
Effective gross income $ 2,092,887
Less operating expenses 628,163
Net operating income $ 1,464,724
Deduct income to land ($2,520,000 x 12.25%)
(9% return + 3.25% adjust, tax rate) 308,700
Net income to improvements $1,156,024
$1,156,024 capitalized at 14.75%
(9% return, 2.5% recapture 3.25% adjust, tax rate)
(rounded) 7,837,500
Add value of land 2,520,000
Value $10,357,500
1978
Effective gross income $ 2,184,663
Less operating expenses 727,039
Net operating income $ 1,457,624
Deduct income to land ($2,520,000 x 11.34%)
(9% return + 2.34% adjust, tax rate) 285,768
Net income to improvements $ 1,171,856
$1,171,856 capitalized at 13.84%
(9% return, 2.5% recapture 2.34% adjust, tax rate)
(rounded) 8,467,200
Add value of land 2,520,000
Value $10,987,200
*204 1979
Effective gross income $ 2,270,621
Less operating expenses 764,311
Net operating income $ 1,506,310
Deduct income to land ($2,520,000 x 11.41%)
(9% return + 2.41% adjust, tax rate) 287,532
Net income to improvements $ 1,218,778
$1,334,440 capitalized at 13.91%
(9% return, 2.5% recapture 2.41% adjust, tax rate)
(rounded) 8,761,900
Add value of land 2,520,000
Value $11,281,900
To summarize, then, this court finds the following values for the tax years in question:
1976 1977
Land $ 2,520,000 Land $2,520,000
Improvements 7,417,700 Improvements 7,837,500
Total $ 9,937,700 Total $10,357,500
1978 1979
Land $ 2,520,000 Land $ 2,520,000
Improvements 8,467,200 Improvements 8,761,900
Total $10,987,200 Total $11,281,900
However, as indicated at the outset of this opinion, the subject property is designated as three separate lots; therefore the judgments to be entered must be allocated by block and lot. Taxpayer’s expert was of the opinion that the values should be apportioned by means of an application of a percentage based upon the total number of apartment units located on that block and lot as compared to the entire complex. His percentages were as follows:
Block 449G, Lot 4 — 240 apartments — 28.6%
*205 Block 449G, Lot 4A — 376 apartments — 44.7%
Block 449G, Lot 4B — 224 apartments — 26.7%
I find this allocation fair and reasonable; therefore I will utilize it to produce the following assessments.
1976 1977
Block 449G, Lot 4 Block 449G, Lot 4
Land $ 720,700 Land $ 720,700
Improvements 2,121,500 Improvements 2,241,600
Total $2,842,200 Total $2,962,300
Block 449G, Lot 4A Block 449G, Lot 4A
Land $1,126,400 Land $1,126,400
Improvements 3,315,800 Improvements 3,503,400
Total $4,442,200 Total $4,629,800
Block 449G, Lot 4B Block 449G, Lot 4B
Land $ 672,800 Land $ 672,800
Improvements 1,980,500 Improvements 2,092,600
Total $2,653,300 Total $2,765,400
1978 1979
Block 449G, Lot 4 Block 449G, Lot 4
Land $ 720,700 Land $ 720,700
Improvements 2,421,700 Improvements 2,505,900
Total $3,142,400 Total $3,226,600
Block 449G, Lot 4A Block 449G, Lot 4A
Land $1,126,400 Land $1,126,400
Improvements 3,784,900 Improvements 3,916,600
Total $4,911,300 Total $5,043,000
Block 449G, Lot 4B Block 449G, Lot 4B
Land $ 672,800 Land 672,800
Improvements 2,260,700 Improvements 2,339,500
Total $2,933,500 Total $3,012,300
The Clerk of the Tax Court is directed to enter judgments accordingly.

The issue of discrimination in assessment for the tax year 1978 had been abandoned by the taxpayer at the pretrial-conference and such abandonment was specifically noted in paragraph 8 of the pretrial order.