TAX COURT OF NEW JERSEY



**Joshua D. Novin**
**Judge**

**Washington & Court Streets, 1st Fl.**
**P.O. Box 910**
**Morristown, New Jersey 07963**
**Tel: (609) 815-2922, Ext. 54680**
**Fax: (973) 656-4305**

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

October 20, 2017

Nathan P. Wolf, Esq.
Law Office of Nathan P. Wolf, LLC
673 Morris Avenue
Springfield, New Jersey 07081

Robert D. Blau, Esq.
Blau & Blau
223 Mountain Avenue
Springfield, New Jersey 07081

> Re:   Jay Jay Improvement v. Elizabeth City
>       Docket Nos. 014284-2011 and 011151-2014

Dear Mr. Wolf and Mr. Blau:

This letter constitutes the court's opinion following trial of the local property tax appeals in the above-referenced matters. Jay Jay Improvement ("plaintiff") challenges the 2011 and 2014 local property tax assessments on an improved parcel of real property located in the City of Elizabeth ("defendant"), County of Union, and State of New Jersey.

For the reasons stated herein, the court reduces the 2011 and 2014 tax year assessments.

## I. Procedural History and Findings of Fact

As of the valuation dates, plaintiff was the owner of the real property and improvements located at 452-456 Edgar Road, Elizabeth, New Jersey. The property is identified on defendant's

municipal tax map as Block 4, Lot 411 (the "subject property"). For the 2011 and 2014 tax years, the subject property was assessed as follows:

Land:          $ 57,600
Improvement: $216,700
Total:          $274,300

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for defendant was 11.80% for the 2011 tax year, and 13.88% for the 2014 tax year. See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the local property tax assessment, the implied equalized value of the subject property is: $2,324,576.20, for the 2011 tax year; and $1,976,224.70, for the 2014 tax year.

The subject property is a rectangular parcel consisting of approximately 24,613 square feet, located along Edgar Road in Elizabeth, New Jersey. Edgar Road intersects U.S. Route 9, affording access to the New Jersey Turnpike and Interstate 278. The subject property is improved with a well-maintained 2½ story, 24-unit brick garden apartment complex. A resident superintendent occupies 1 of the 24 apartment units, and is afforded free rent for furnishing superintendent services. The complex consists of 11 one-bedroom apartments, 12 two-bedroom apartments, and 1 studio/efficiency apartment. The improvements were constructed in approximately 1972. There is on-site "open" automobile parking available to the tenants. The lower level of the structure contains a laundry area, owned by plaintiff, for tenant use. Each apartment is heated by a central-gas-fired boiler with a baseboard hot water heating system. The boiler was recently converted from heating fuel oil to natural gas. The landlord furnishes each apartment with an air conditioning unit, a refrigerator, and stove/oven. Each apartment has a kitchen finished with wood cabinetry, Formica countertops, and vinyl tile flooring. In addition, each apartment contains a three-fixture bathroom, with ceramic tile flooring. The balance of the flooring in each apartment is finished

hardwood flooring. Little additional testimony was adduced during trial with respect to the age of the kitchen cabinetry, countertops, appliances, and bathroom fixtures, including when renovations or replacements were last undertaken. The subject property is self-managed by the plaintiff.

As of the valuation dates involved herein, defendant had enacted a rent control ordinance, which was applicable to the subject property. The rent control ordinance limited the rent increase a landlord may charge to apartment dwelling units to a percentage of the consumer price index.

Plaintiff filed petitions of appeal with the Union County Board of Taxation (the "Board") challenging the 2011 and 2014 tax year assessments on the subject property. The Board issued judgments dismissing plaintiff's 2011 and 2014 petitions of appeal without prejudice. Plaintiff filed timely Complaints with the Tax Court contesting the Board's judgments.

During trial, plaintiff offered testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation ("plaintiff's expert" or "the expert"). The expert inspected the subject property and prepared an appraisal report that complied with the Uniform Standards of Professional Appraisal Practice, expressing an opinion of the true market value of the subject property as of the October 1, 2010, and October 1, 2013 valuation dates. Defendant offered no expert testimony to the court.

The expert offered his opinion that the subject property had a true market value of: (a) $1,275,000, as of the October 1, 2010 valuation date; and (b) $1,245,000, as of the October 1, 2013 valuation date.

## II. Conclusions of Law

a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness. . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Township v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000), certif. denied, 165 N.J. 488 (2000)). "Only after the presumption is overcome with sufficient

evidence. . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the plaintiff has overcome the presumption of validity. If the court independently concludes that plaintiff has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According plaintiff all reasonable and legitimate inferences that can be deduced from the evidence presented, the court concludes that plaintiff produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of plaintiff's expert and the facts upon which he relied raise debatable questions regarding the correctness of the subject property's tax assessments for the 2011 and 2014 tax years.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., supra, 100 N.J. at 413).

b. <u>Highest and Best Use</u>

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. <u>See</u> <u>Petrizzo v. Edgewater</u>, 2 <u>N.J. Tax</u> 197, 200 (Tax 1981); <u>Genola Ventures v. Shrewsbury Bor.</u>, 2 <u>N.J. Tax</u> 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of a property's true market value is discerning its highest and best use. <u>Ford Motor Co. v. Township of Edison</u>, 10 <u>N.J. Tax</u> 153, 161 (Tax 1988), <u>aff'd o.b.</u>, 12 <u>N.J. Tax</u> 244 (App. Div. 1990), <u>aff'd</u>, 127 <u>N.J.</u> 290 (1992). <u>See also</u> <u>General Motors Corp. v. City of Linden</u>, 22 <u>N.J. Tax</u> 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." <u>Entenmann's Inc. v. Totowa Borough</u>, 18 <u>N.J. Tax</u> 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." <u>Ford Motor Co.</u>, <u>supra</u>, 10 <u>N.J. Tax</u> at 161.

The phrase highest and best use is defined as follows:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [Appraisal Institute, <u>The Dictionary of Real Estate Appraisal</u> (5th ed. 2010).]

Thus, the highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive."

6

Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, after consideration of the foregoing four criteria, the expert concluded that the highest and best use of the subject property, as vacant and improved, is the "existing use as a rental apartment building." The court finds that the expert's conclusion is supported by the trial record. Accordingly, the court determines that the highest and best use of the subject property, as vacant, and as improved, is the existing use of the subject property as a 24-unit apartment complex.

c. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Township, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291 (2001)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Township, 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Township, 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other

7

approach, the court may conclude which approach should prevail. ITT Continental Baking Co., supra, 1 N.J. Tax 244; Pennwalt Corp. v. Holmdel Township, 4 N.J. Tax 51 (Tax 1982).

1. Income Capitalization Approach

When a property is income-producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Township of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). The income capitalization approach is "based on the principle of anticipation, which states that value is created by the expectation of benefits to be derived in the future. In other words, the value of an apartment property reflects what a prudent purchaser-investor would pay for the present worth of an anticipated annual income stream and the reversionary benefit to be realized at the end of the anticipated holding period." Appraisal Institute, The Valuation of Apartment Properties, 97 (2nd ed. 2008). Thus, the income capitalization approach converts the benefits to be realized from a future stream of income and reversionary benefit into a present value. As Judge Hopkins succinctly stated, in valuing a property using the income capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Bor., 1 N.J. Tax 373, 377 (Tax 1980).]

Here, the court concludes, as did the expert, that the income capitalization approach is the most appropriate method to derive an estimated market value for the subject property.

a. Market Rent

The first and often most critical "step in applying the income approach is to accurately forecast the future income and expenses associated with ownership of the property." The Valuation of Apartment Properties, supra, at 97. Forecasting a property's gross rental income requires an expert to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, supra, 108 N.J. at 270; see also New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537 (1963).

The term market rent or economic rent, refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, supra, at 121-22. The market rent ascribed to a property under the income approach may differ substantially from the "contract rent," or actual rent collected by the owner of the property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972).

In order to compute the subject property's estimated annual apartment rental income, the expert first examined the subject property's rent schedules as of the October 1, 2010 and October 1, 2013 valuation dates. Thereafter, plaintiff's expert compared the rent schedules to plaintiff's responses to annual requests for income and expenses from defendant's municipal tax assessor, under N.J.S.A. 54:4-34 ("Chapter 91 responses"). Plaintiff's rent schedules reported gross monthly apartment rental revenues, exclusive of the superintendent's unit, of: $19,992.00, as of

9

October 1, 2010, and $21,082.00, as of October 1, 2013. Thus, in order to compute the subject property's Potential Gross Income the expert multiplied the gross monthly apartment rental revenues by 12 months. Accordingly, the expert determined a Potential Gross Income from apartment rentals of: $239,904, for the 2011 tax year ($19,992 x 12 = $239,904); and $252,984, for the 2014 tax year ($21,082 x 12 = $252,984).

The actual rents paid in a well-managed apartment complex are clear evidence of economic rent. G & S Co. v. Borough of Eatontown, 2 N.J. Tax 94, 98 (Tax 1980), aff'd, 6 N.J. Tax 218 (App. Div. 1982). In Parkview Village Assocs. our Supreme Court explained that:

> [i]n the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project. . . functioning as customary with leases of relatively short length, should be deemed *prima facie* to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent.
>
> [Parkview Village Associates v. Collingswood, 62 N.J. 21, 34 (1972).]

Hence, when an apartment complex is well-managed, the court is required to accord the taxpayer a presumption that the actual rent collected, as of the assessing date, equals the economic rent. Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 276 (1985). When the "gross rental value of the property on the respective assessing dates . . .[is] based on the actual rent rolls and. . . no convincing testimony [was presented] that the management was not charging market rent," that is the most trustworthy evidence of income. Jefferson House Investment Co. v. Chatham, 4 N.J. Tax 669, 676-77 (1982). "An analysis of rents must begin with the *present* rent schedule for the subject property." Brunetti v. City of Clifton, 7 N.J. Tax 161, 172 (Tax 1984). Accordingly, when

10

available, the "actual rent roll" of a property as of the "critical assessing date" is fundamental to determining the true value of a property. Glen Wall Assocs., supra, 99 N.J. at 274.

A municipality can only overcome this presumption by presenting "'convincing evidence' that (1) the leases are not economic because the property is not well managed, (2) the leases are not economic because they are old, long term leases, or (3) the leases are not economic as shown by a comparison with at least four comparable apartment properties." Parkway Village Apartments Co., supra, 108 N.J. at 272.

Here, none of the foregoing exceptions are applicable. Defendant has offered no evidence, let alone "convincing evidence," that the subject property was not well-managed; that plaintiff's October 1, 2010 and October 1, 2013 rent schedules did not reflect market rent because they arose from old, long term leases; or that defendant has analyzed not less than four competitive apartment complexes, and determined that plaintiff's rents are not economic. Moreover, defendant offered no evidence that plaintiff failed to maximize the permissible rents under defendant's rent control ordinance. In sum, defendant offered no empirical evidence to lead the court to conclude that the actual rents collected by plaintiff and rent schedules, as of October 1st of each pre-tax year, were not representative of economic rent. Therefore, the court concludes that the actual rents collected by plaintiff, and reported on plaintiff's October 1, 2010 and October 1, 2013 rent schedules, are the best evidence of economic rent.

### b. Other Income

The expert reported plaintiff derived additional income of approximately $1,800 annually from operating the laundry amenities in the subject property. Thus, in calculating the Effective Gross Income, the expert included "Laundry Commissions" of $1,800, as additional or other income for the subject property for the 2011 and 2014 tax years.

11

In an apartment complex, the income that a property owner receives is not merely income generated from the rental of the real estate, but rather is the net income of the business conducted on the real estate. Thus, it is common in an apartment complex to generate "non-rent other income" from a variety of sources, including parking, amenities (such as a pool or tennis court), laundry facilities, application fees, late charges, etc. The Valuation of Apartment Properties, supra, at 13. In effect, under certain circumstances, a percentage of an apartment complex's income stream may be "imputable to intangible as well as tangible personalty." Id. at 99. When performing an income capitalization approach to value an apartment complex, the difficulty arises in segregating the income attributable to use of the real estate from the income generated by the operation of the business.

The term Potential Gross Income comprises and is defined as:

> rent for all space in the property – e.g. contract rent for current leases, market rent for vacant or owner-occupied space. . .
> rent from escalation clauses
>
> reimbursement income
>
> all other forms of income to the real property – e.g., income from services supplied to the tenants, such as. . . storage, and garage space, and income from coin operated equipment and parking fees.
>
> [Appraisal Institute, The Appraisal of Real Estate, 478 (14th ed. 2013).]

Accordingly, the court concludes, as did the expert, that amounts received for amenities furnished should be included as additional or other income. Thus, the court shall include the laundry amenity fees received by plaintiff as additional or other income of the subject property.

In addition, the term Effective Gross Income is defined as the "anticipated income from all operations of the real property after an allowance is made for vacancy and collection losses and an addition is made for any other income." The Appraisal of Real Estate, supra, at 451 (emphasis

12

added).  Thus, the court concludes, as did plaintiff's expert, that the additional or other income should be added to the Potential Gross Income after the appropriate allowance has been made for vacancy and collection losses.

c. Vacancy and Collection Loss

Vacancy and collection losses are "usually estimated as a percentage of Potential Gross Income, which varies depending on the type and characteristics of the physical property, the quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions." The Appraisal of Real Estate, supra, at 478.

The expert applied a vacancy and collection loss factor of 5% of Potential Gross Income for the 2011 and 2014 tax years.  Plaintiff's expert consulted vacancy rates of the Union County apartment submarket, published by Marcus & Millichap, a real estate brokerage service, which revealed average vacancy rates of 4.5% for the 4th quarter 2010, and 4.7% for the 3rd quarter 2013. He further reviewed 2011 and 2013 vacancy rates published by the Institute of Real Estate Management ("IREM"), for conventional low-rise apartment complexes constructed between 1965 and 1979.  The expert's analysis of those reports disclosed vacancy rates between 4.4% and 7.8%.  Accordingly, the expert concluded that a vacancy and collection loss factor of 5% of Potential Gross Income was reasonable for the subject property.

The court finds that the expert's vacancy and collection loss factor is adequately supported in the record with evidence derived from market data.  Therefore, the court will apply a vacancy and collection loss factor of 5% of Potential Gross Income for the 2011 and 2014 tax years.

13

d. Operating Expenses

The third step in the income capitalization approach is determination of the appropriate operating expense deductions. Operating expenses are the "periodic expenditures necessary to maintain the real property and continue production of the effective gross income, assuming prudent and competent management." The Appraisal of Real Estate, supra, at 479.

When the actual operating expenses of a well-managed apartment complex are 'within normal operating limits,' they should be accepted and deemed representative of the marketplace. Parkway Village Apartments Co., supra, 8 N.J. Tax at 441-42. Conversely, when the evidence discloses that a property's economic rents are market derived, but the actual expenses are outside of acceptable norms, an adjustment must be fashioned to fit the "well-managed" standard. Equitable Life Assur. Soc'y of U.S. v. Township of Secaucus, 16 N.J. Tax 463, 467 (App. Div. 1996). That is not to say that every operating expense must be accepted, adjusted, or stabilized in its entirety. An appraiser may elect to accept those operating expenses that an appraiser considers reasonable and typical of industry norms, and reject those that are irregular, uncharacteristic, and anomalous. The use of "both actual and stabilized expenses is acceptable appraisal practice." Maple Court Associates Ltd. v. Ridgefield Park Twp., 7 N.J. Tax 135, 153 (Tax 1984); See also Rudd v. Cranford Twp., 4 N.J. Tax 236, 244 (Tax. 1982); Skytop Gardens Inc. v. Sayreville Bor., 3 N.J. Tax 187, 194-96 (Tax 1981).

Here, the expert reviewed plaintiff's actual operating expense statements for the 2008 through 2013 calendar years in order to gauge the subject property's annual expenses from year to year. In certain instances, the expert accepted the actual expenses of the subject property as customary and reasonable, however in others the expert applied stabilized operating expenses.

14

The expert reported that plaintiff's insurance expenses were "unusual to me," because during the calendar years 2008, 2009, 2010, and 2011, plaintiff reported insurance expenditures between $19,023 and $21,774, or $792.63 and $907.25 per apartment. Conversely, during the 2012 and 2013 tax years, plaintiff reported insurance expenses of between $11,909 and $12,199, or $496.21 and $508.29 per apartment. The expert could not account for these material deviations. Therefore, the expert consulted commercially available data sources to formulate a stabilized insurance expense. The expert expressed that "the insurance reported in the IREM [Institute of Real Estate Management surveys] is typically 3% or 4% [of Potential Gross Income]." Plaintiff's expert stabilized the insurance expense at $12,000 for the 2011 and 2014 tax years, or approximately 5% of Potential Gross Income. However, the expert offered no explanation why the stabilized insurance expense for the subject property should exceed the range contained in the IREM surveys. Therefore, the court concludes a stabilized insurance expense of 4% of Potential Gross Income is reasonable, and supported by IREM surveys included in the appendix to the expert's report.

The expert further explained that he accepted the actual water and sewer charges reported by plaintiff of $10,556 for the 2010 calendar year. However, plaintiff's expert apparently elected to reject the actual water and sewer charges reported by plaintiff for the 2013 calendar year of $9,549, and instead applied a stabilized expense amount of $10,000. The expert offered no explanation for his inconsistency on this issue. Accordingly, the court will accept and apply the actual water and sewer charges reported by plaintiff of $10,556 during the 2010 calendar year, and $9,549 during the 2013 calendar year.

The expert expressed that heating fuel oil and natural gas expenses are dependent upon changing weather conditions from year-to-year. Accordingly, the expert applied the "average of

15

the three years [20]08, [20]09, and [20]10 [fuel and gas expenses]." In his opinion, "I'm sure that an investor in this property would not take a one year figure, but average the three years prior to the year he was going to invest in the property." Utility expenses are variable expenses that must be "projected based on an analysis of past charges and current trends." Appraisal of Real Estate, supra, at 481. Thus, it is not unreasonable for an expert to average actual expenses in computing stabilized expense amounts. See Maple Court Associates Ltd., supra, 7 N.J. Tax at 153 (concluding that "consistency requires that these figures should be stabilized and averaged over the same three years as other expenses.") Ultimately, the expert stabilized heating fuel oil and natural gas expenses at $10,645, for the 2010 calendar year, and $12,133, for the 2013 calendar year. The court finds the expert's heating fuel oil and natural gas expense amounts reasonable.

The expert further deducted stabilized expenses for: (a) common area electricity, $2,400 in tax years 2010 and 2013; and (b) garbage removal, $3,600 in tax years 2010 and 2013; (c) cleaning expenses, $3,600 in tax year 2010, and $3,800 in tax year 2013. The court will accept the expert's stabilized expenses for common area electricity and garbage removal. However, the court must reject the expert's deduction for cleaning expenses. The expert credibly testified that the superintendent is afforded free rent in exchange for furnishing maintenance, repair, and cleaning services to the subject property. Therefore, inclusion of an expense for cleaning services performed, or expected to be performed by the subject property's superintendent is inappropriate.

According to the expert, maintenance and repairs includes general maintenance and repairs, landscaping, supplies, snow removal, and exterminating. However, because the actual maintenance and repair expenses identified in plaintiff's Chapter 91 responses were, in the expert's words, "pretty much all over the place," he applied stabilized maintenance and repair expenses. In order to compute his maintenance and repair expense, the expert consulted IREM surveys, which

revealed that maintenance and repair expenses are generally between 7½% - 8% - 8½% of Potential Gross Income for a garden apartment complex of this age.  The expert applied a maintenance and repair expense factor of 7.5% of Potential Gross Income, or $18,000 for the 2011 tax year, and 8.3% of Potential Gross Income, or $21,000 for the 2014 tax year.  The court finds the expert's maintenance and repair expenses reasonable.

The expert further applied a painting expense of $5,495.  The expert estimated that the cost to paint the exterior and common areas of the building was $12,000, which he amortized over a five-year period, or $2,400 per year.  In addition, the expert estimated the cost to paint the interior of the apartment units was $12,375, which he amortized over a four-year period, or $3,095 per year.  The court will accept the expert's painting expense figures.

Plaintiff's expert applied a replacement reserve for appliances, based on their anticipated life expectancies, of $2,340 for the 2011 and 2014 tax years.  In addition, the expert applied a reserve for the replacement of "major projects," such as the roof, windows, and boiler, amounting to 2% of Effective Gross Income, or $4,500 for the 2011 tax year, and $5,250 for the 2014 tax year.  The court finds the expert's replacement reserve amounts reasonable.

The expert further applied a management fee of 5% of Effective Gross Income, which the expert explained was supported by IREM surveys contained in the appendix to his report.  The court's review of the IREM surveys supports the expert's proposed management fee.

Finally, the expert applied an expense for professional fees, inspections and miscellaneous expenses of $3,000 for the 2011 and 2014 tax years, or approximately 1% of the subject property's Effective Gross Income.  The court accepts the expert's professional and miscellaneous fee expense amount.

e. Capitalization

Direct capitalization is a "method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, supra, at 491. Thus, the capitalization rate is the device that converts net operating income into an estimate of property value.

Here, in deriving his capitalization rates, the expert consulted investor surveys, personally available data, and employed the Band of Investment technique. The investor surveys are completed by market participants engaged in real estate financing transactions during given periods of time. The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc. This court has "sanctioned" the use of data collected and commercially published by analytical firms and trade associations, such as RERC, American Council of Life Insurance, and Korpacz/PWC. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Hull Junction Holding, supra, 16 N.J. Tax. at 83.

The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Id. at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate, 467 (10th ed 1992)). In employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may

18

evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 279-80 (1985)).

Here, the expert reviewed Real Estate Research Corporation ("RERC") surveys for the 3rd quarter 2010 and 3rd quarter 2013 to develop his capitalization rate. In addition, the expert offered testimony regarding his familiarity with these transaction types, furnishing the court with copies of HUD-1 Settlement Statements, Deeds, and Promissory Notes for the purchase of two apartment complexes in northern New Jersey in which he invested. According to the documents supplied, the real estate transactions were consummated in July 2009 and March 2010.

For the 2011 and 2014 tax years, the expert assumed: (i) a 6.25% interest rate; (ii) a 20-year mortgage amortization period; (iii) a 75% loan-to-value ratio; and (iv) a 7.50% equity dividend rate. The resulting base capitalization rate for the 2011 and 2014 tax years was 8.453%.

The court considered the testimony of the expert and has reviewed the supporting surveys, tables of information and mortgage/equity calculations and finds that although the expert's proposed capitalization rates are not egregious, they require adjustments. The court's review of the RERC surveys for 'First-Tier Investment Properties' in the 'Northern NJ' apartment marketplace discloses: (i) an East Region capitalization rate of 7.3% during the 3rd quarter 2010; and (ii) an East Region capitalization rate of 6.2% during the 4th quarter 2013. Moreover, the capitalization rates identified in RERC's 'Third-Tier Investment Properties' under the 'East' regional criteria discloses: (i) a range of capitalization rates between of 7% to 12% during the 3rd quarter 2010; and (ii) a range of capitalization rates between of 6.1% to 13% during the 4th quarter 2013. The court recognizes that the capitalization rates for "First-Tier" investment grade property would not be applicable to the subject property. Although the subject property is well maintained and located in a suitable location, due to its modest twenty-four apartment unit size, the subject

19

property would not be characterized as a "First-Tier" investment grade property. However, due to its age, quality, and location in Union County, New Jersey, the court finds that a capitalization rate within the 'Third-Tier' investment property range is appropriate. Accordingly, the court will apply the following base capitalization rates to the net operating income of the subject property: 7.55% for 2011 tax year and 6.675% for 2014 tax year.

After computing his base capitalization rate the expert added or "loaded" a tax factor to each valuation year to derive his overall capitalization rates. The tax factor represents the real estate taxes payable by plaintiff arising from operation of the subject property.

For the reasons set forth above, the court finds the true value of the subject property to be $1,453,360, for the 2011 tax year, and $1,528,325 for the 2014 tax year.

**2011 Tax Year**

INCOME:

| | | |
|---|---|---|
| $19,992 monthly rental income x 12 months | | $ 239,904 |
| TOTAL: POTENTIAL GROSS INCOME | | $ 239,904 |
| LESS: Vacancy & Collection Loss | @ 5% | ($ 11,995) |
| | | $ 227,909 |
| PLUS: Laundry Commissions | | $ 1,800 |
| TOTAL: EFFECTIVE GROSS INCOME | | $ 229,709 |

EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ 4% of PGI | $ 9,596 | |
| Water & Sewer | | $ 10,556 | |
| Natural Gas/Fuel | | $ 10,645 | |
| Electric (Common Area) | | $ 2,400 | |
| Garbage Disposal | | $ 3,600 | |
| Repairs/Maintenance | | $ 18,000 | |
| Painting | | $ 5,495 | |
| Appliance Replacement | | $ 2,340 | |
| Replacement Reserves | | $ 4,500 | |
| Management | @ 5% of EGI | $ 11,485 | |
| Professional Fees/Inspections/Misc. @ 1% of EGI | | $ 2,297 | |
| | | $ 80,914 | |
| TOTAL: EXPENSES | | | ($ 80,914) |
| | | | |
| NET OPERATING INCOME | | | $ 148,795 |

| | |
|---|---|
| Capitalization Rate | 7.55% |
| Plus: Effective Tax Rate | 2.688% |
| TOTAL CAPITALIZATION RATE | 10.238% |

INDICATED VALUE                                  $1,453,360

**2014 Tax Year**

INCOME:

| | | |
|---|---|---|
| $21,082 monthly rental income x 12 months | | $ 252,984 |
| TOTAL:POTENTIAL GROSS INCOME | | $ 252,984 |
| LESS:   Vacancy & Collection Loss | @ 5% | ($   12,649) |
| | | $ 240,335 |
| PLUS:   Laundry Commissions | | $    1,800 |
| TOTAL: EFFECTIVE GROSS INCOME | | $ 242,135 |

EXPENSES:

| | | |
|---|---|---|
| Insurance          @ 4% of PGI | $ 10,119 | |
| Water & Sewer | $   9,549 | |
| Natural Gas/Fuel | $ 12,133 | |
| Electric (Common Area) | $   2,400 | |
| Garbage Disposal | $   3,600 | |
| Repairs/Maintenance | $ 21,000 | |
| Painting | $   5,495 | |
| Appliance Replacement | $   2,340 | |
| Replacement Reserves | $   5,250 | |
| Management          @ 5% of EGI | $ 12,107 | |
| Professional Fees/Inspections/Misc. @ 1% of EGI | $   2,421 | |
| | $ 86,414 | |
| TOTAL: EXPENSES | | ($     86,414) |
| NET OPERATING INCOME | | $  155,721 |

| | |
|---|---|
| Capitalization Rate | 6.675% |
| Plus: Effective Tax Rate | 3.514% |
| TOTAL CAPITALIZATION RATE | 10.189% |

| | |
|---|---|
| INDICATED VALUE | $1,528,325 |

Having reached a conclusion of the true market value of the subject property, the court will determine the correct assessment for the 2011 and 2014 tax years.  Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property...." N.J.S.A. 54:51A-6(a).  This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).  When the ratio of assessed value exceeds the upper

limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

True market value     x     Average ratio  =     Revised taxable value

For the 2011 tax year, application of the Chapter 123 ratio results in an upper limit of .1357 and lower limit of .1003. The ratio of total assessed value, $274,300, to true market value, $1,453,360, yields a ratio of .1887%, which exceeds the upper limit. Consequently, the calculation of the tax assessment for the 2011 tax year is:

$1,453,360     x     .1180  =     $171,500 [ROUNDED]

Accordingly, a judgment establishing the subject property's tax assessment for the 2011 tax year will be entered as follows:

| | |
|---|---|
| Land | $ 57,600 |
| Improvement | $113,900 |
| Total | $171,500 |

For the 2014 tax year, application of the Chapter 123 ratio results in an upper limit of .1596 and lower limit of .1180. The ratio of total assessed value, $274,300, to true market value, $1,528,325 yields a ratio of .1795%, which exceeds the upper limit. Consequently, the calculation of the tax assessment for the 2011 tax year is:

$1,528,325     x     .1388  =     $212,100 [ROUNDED]

Accordingly, a judgment establishing the subject property's tax assessment for the 2014 tax year will be entered as follows:

| | |
|---|---|
| Land | $ 57,600 |
| Improvement | $154,500 |
| Total | $212,100 |

**III.** **Conclusion**

For the above stated reasons, the court reduces the 2011 and 2014 tax year assessments on the subject property.

Very truly yours,


/s/Hon. Joshua D. Novin, J.T.C.